## SECURITIES AND EXCHANGE COMMISSION *v.* NEW ENGLAND ELECTRIC SYSTEM ET AL.

No. 305.  Argued January 18, 1968.—
Decided March 5, 1968.

*Daniel M. Friedman* argued the cause for petitioner. With him on the briefs were *Solicitor General Griswold, Robert S. Rifkind, Philip A. Loomis, Jr., David Ferber, Roger S. Foster* and *Richard E. Nathan.*

*John R. Quarles* argued the cause for respondents. With him on the brief were *Richard B. Dunn, Richard W. Southgate* and *John J. Glessner III.*

*George Spiegel* filed a brief for the Municipal Electric Association of Massachusetts, as *amicus curiae,* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondent New England Electric System (NEES), a holding company registered under § 5 of the Public Utility Holding Company Act of 1935,[1] controls both an integrated electric utility system and an integrated gas utility system.[2] Section 11 (b) of the Act requires the Securities and Exchange Commission to limit the operations of a holding company system to a single integrated public utility system, except the Commission may permit the holding company to continue control of any additional integrated utility system that the Commission determines, among other things, "cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system . . . ."[3] In 1957 the Securities and Exchange

---

[1] 49 Stat. 812, 15 U. S. C. § 79e.

[2] At the time of this proceeding, the integrated electric utility system consisted of seven electric utility companies serving parts of New Hampshire, Massachusetts, Rhode Island, and Connecticut. The integrated gas utility system consisted of eight Massachusetts gas companies. NEES also controlled a service company which provided services for the whole NEES operation.

[3] Section 11 (b) of the Public Utility Holding Company Act of 1935, 49 Stat. 820, 15 U. S. C. § 79k (b), provides in pertinent part: "It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system . . . : *Provided, however,* That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems, if, after notice and opportunity for hearing, it finds that—

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which

Commission instituted proceedings to determine whether NEES should be permitted to retain control of both the electric and gas systems. The Commission initially found that the electric companies constituted a single integrated electric utility system, 38 S. E. C. 193 (1958), and NEES elected to retain those companies as its principal system. NEES urged, however, that it should also be permitted to retain the gas system. After extensive hearings, the Commission refused respondent permission to do so, and ordered the gas system divested. 41 S. E. C. 888 (1964).

In reaching its conclusion the Commission construed the statutory phrase "loss of substantial economies" in Clause A of § 11 (b)(1) to require a showing that the "additional system cannot be operated under separate ownership without the loss of economies so important as to cause a serious impairment of that system." In its first review of the Commission's order, the Court of Appeals for the First Circuit held that the Commission had erroneously construed the statute; in the court's view, "loss of substantial economies" merely "called for a business judgment of what would be a significant loss . . . ." The court therefore set aside the Commission's order and remanded for reconsideration in light of that test. 346 F. 2d 399, 406. We reversed, approving the Commission's construction, and remanded to the Court of Appeals for review of the challenged order in light of the proper meaning of the statutory term. *SEC* v. *New England Electric System*, 384 U. S. 176 (*NEES I*). On remand, the Court of Appeals again set aside the Commission's order. 376 F. 2d 107.[4] That court, "after a

can be secured by the retention of control by such holding company of such system . . . ."

[4] On remand, the Court of Appeals interpreted the "serious impairment" standard as requiring proof only of "a condition allowing survival but not on a sound or 'healthful continuing' basis,"

fresh review of all the evidence," concluded "that the Commission's opinion does not reveal that application of both reason and experience to facts which merits endorsement as the responsible exercise of expertise." *Id.*, at 111. We granted certiorari. 389 U. S. 816. We reverse and remand to the Court of Appeals with direction to enter a judgment affirming the Commission's order.

The question for our decision is whether the Court of Appeals properly held that, on the record, the Commission erred in finding that NEES failed to prove a case for retention of the integrated gas utility system. We address that question against the background of a congressional objective to protect consumer interests through the "elimination of 'restraint of free and independent competition.' . . . One of the evils that had resulted from control of utilities by holding companies was the retention in one system of both gas and electric properties and the favoring of one of these competing forms of energy over the other." *NEES I*, 384 U. S., at 183.[5] Congress therefore ordained separate ownership—and divestiture where necessary to reduce holdings to one system—as the " 'very heart' of the Act." *Id.*, at 180. Although Congress was aware that some economic loss might be suffered by the parent holding company or the separated integrated utility, Congress relented only to the extent of authorizing the Commission to permit retention of an additional integrated utility if that permission might be granted under the narrow exception provided by § 11 (b)(1). But "retention of an 'additional' integrated system is decidely the exception," and the

---

rather than proof that severance "will result in imminent bankruptcy . . . ." 376 F. 2d, at 109. The Commission has not contested this interpretation in this Court.

[5] "By fostering competition between gas and electric utility companies, the Act promotes what has been described as 'variegated competition.' " *NEES I*, 384 U. S., at 184, n. 15.

burden is on the holding company to satisfy the "stringent test" set by the statute. *Id.,* at 180, 182; cf. *United States* v. *First City Nat. Bank,* 386 U. S. 361, 366.

Congress committed to the Commission the task of determining whether a holding company has met the burden of showing that its situation falls within the narrow exception under § 11 (b)(1). The Clause A determination whether separation entails a loss of economies likely to cause a serious impairment of the system involves an element of prediction which necessarily calls for difficult and expert judgment. That judgment requires the assessment of many subtle and often intangible factors not easily expressed in precise or quantifiable terms. This is the very nature of economic forecasting. The task calls for expertise and is not simply "an exercise in counting commonplaces." *United States* v. *Drum,* 368 U. S. 370, 384; see *NEES I,* 384 U. S., at 184–185. Judicial review of that expert judgment is necessarily a limited one. See *Gray* v. *Powell,* 314 U. S. 402, 412–413; *NLRB* v. *Hearst Publications,* 322 U. S. 111, 131; *Atlantic Ref. Co.* v. *FTC,* 381 U. S. 357, 367–368; *United States* v. *Drum, supra,* at 375–376. Congress expressly provided that "[t]he findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U. S. C. § 79x (a); see *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474; cf. *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 236. In our view, the Court of Appeals in this case indulged in an unwarranted incursion into the administrative domain.[6] The Commission's order has adequate support in the record and should have been affirmed.

---

[6] The following passage is from the court's opinion on remand:

"Even without the burden of proving likely demise, [NEES'] burden is, as the Court said, to meet 'a much more stringent test' than that of a probable significant loss. But, if the standard to be applied to [NEES] is stringent, so is the level of analysis and

As of 1958, the test year selected for purposes of these proceedings,[7] NEES' eight gas subsidiaries provided retail service to some 237,000 customers in a relatively compact 660-square-mile franchise area in Massachusetts. NEES' electric companies also served 75% of this area and about 78% of the gas customers were also electric customers. NEES' gross investment in gas plant and equipment was about $56,300,000 and gross gas revenues for 1958 were about $22,700,000. The eight gas companies were organized administratively as a Gas Division with centralized management, marketing and supply, operations, and merchandising departments.[8] The chief executive of the Gas Division was also president of each gas company and ultimately responsible to NEES' vice president in charge of management; in short, top management rested with executives having joint control over both electric and gas operations.

The Commission had before it a "severance study," a cost analysis and projection prepared for NEES by a professional public utilities management consulting firm, Ebasco Services, Inc. This study projected a loss of economies of approximately $1,100,000 annually for the gas system as the result of its separation from NEES. The Commission dealt with this study in alternative ways. It analyzed the study and concluded that "[t]he Ebasco estimate is inadequately supported in a number of important aspects and leaves considerable doubts

---

expertise to be exercised by the Commission. We have, only after a fresh review of all the evidence in the light of this most stringent practical standard, concluded that the Commission's opinion does not reveal that application of both reason and experience to facts which merits endorsement as the responsible exercise of expertise." 376 F. 2d, at 111.

[7] This was the latest year for which audited financial statements were available at the time of the hearing before the Commission. 41 S. E. C., at 889, n. 3.

[8] All but one of the eight companies are located within 48 miles of the division headquarters; one is 80 miles away.

which [NEES has] not satisfactorily overcome in the record." Then it went on to find that even if the estimated $1,100,000 in loss of economies were accepted as accurate "it would not lead us to conclude that such a loss is so substantial, when compared with the loss of economies involved in prior divestment cases and viewed in light of the objectives of the Act, as to warrant retention of the gas properties . . . ." 41 S. E. C., at 895, 897. Because we conclude that the record supports the Commission's decision on the latter ground, we have no occasion to consider whether the Commission's strictures on the reliability of the Ebasco study are well founded.

The Commission's ultimate finding that the projected $1,100,000 loss of economies annually did not constitute a loss of "substantial" economies within Clause A of § 11 (b)(1) was reached primarily upon the basis of its subsidiary findings upon three matters: (1) That NEES' estimated losses were not significantly out of line with those found insubstantial in previous cases; (2) that other nonaffiliated Massachusetts gas companies,[9] all but one of them smaller than the NEES gas system, are apparently able to operate successfully without electric utility affiliations; (3) that NEES did not establish that independent management devoted solely to promoting gas sales would not result in benefits to offset some of the projected losses. The Court of Appeals held that none of the three subsidiary findings was supported by substantial evidence. We disagree.

I.

The Commission, consistent with its practice in prior cases,[10] weighed NEES' estimated $1,100,000 losses in

---

[9] "Nonaffiliated" or "independent" refers to gas companies not having any electric affiliations and gas companies not jointly operated with electric companies serving the same franchise area.

[10] E. g., Philadelphia Co., 28 S. E. C. 35, 50–52 (1948); General Pub. Util. Corp., 32 S. E. C. 807, 837 (1951).

relative rather than absolute terms, calculating the losses as a percentage of NEES' 1958 revenues, expenses, and income.[11] It found these loss ratios to be "lower or not significantly higher than corresponding ratios of gas systems whose divestment we have required on the ground that the estimated loss of economies was not substantial within the meaning of clause A." 41 S. E. C., at 898. The cases with which these particular comparisons were made involved companies outside Massachusetts.[12] The Court of Appeals held that the comparisons with the loss ratios of companies involved in prior cases were "largely irrelevant" because ". . . these ratios are significant only as they affect the investment structure of the companies in the particular case, and different companies may be compared only on the assumption that both operate at the same level." 376 F. 2d, at 113, 115. The court's ultimate conclusion was that only close analysis of NEES' own "particular circumstances" was relevant to the Commission's inquiry.

It is significant, however, that the Court of Appeals' criticism of the Commission's use of ratios relied heavily on the court's reading of the statistical data in evidence as showing that the projected loss of economies "would decrease [NEES'] rate of return from 6.4 per cent in 1959 to 4.1 per cent on the projected basis," or some 30% below, "an average rate of 5.9 per cent for the non-

---

[11] The losses would amount to: 4.8% of operating revenues; 6.0% of operating revenue deductions (excluding federal income taxes); 23.3% of gross income (before federal income taxes); 29.9% of net income (before taxes).

[12] See *Engineers Pub. Service Co.*, 12 S. E. C. 41, 55–61, 78–81 (1942); *North Amer. Co.*, 18 S. E. C. 611 (1945); *Philadelphia Co.*, 28 S. E. C. 35, 45–53 (1948); *General Pub. Util. Corp.*, 32 S. E. C. 807, 814–815, 823–839 (1951); *Middle So. Util., Inc.*, 35 S. E. C. 1 (1953), 36 S. E. C. 383 (1955). The relevant financial data for each case are summarized in an appendix to the Commission's opinion. 41 S. E. C., at 905.

affiliated Massachusetts gas companies . . . ." 376 F. 2d, at 114. But, as the Commission has noted, the court's computation that the separated companies would realize a return of only 4.1% contained a serious error, for it overlooked the allowance to be made for income tax deductions generated by the projected losses. The actual rate of return taking such deductions into account would be a significantly higher 5.2%.[13]

In any event, we may agree that the ratios of losses of revenues, expenses, and income are necessarily affected

---

[13] Rate of return is the percentage of net operating income to the rate base, which is fixed by a formula tied generally to the value of capital assets. The source of the 4.1% figure appears to have been the Court of Appeals. The 4.1% was apparently derived as follows:

(a) $\dfrac{\$\ 3,050,988\ \text{(1959 net oper. income after taxes)}}{\$47,723,162\ \text{(rate base)}} = 6.4\%$ rate of return

(b) $\ \ \ \$\ 3,050,988$
$\ \ - \ \ 1,098,600$ (projected losses)
$\ \ \ \ \$\ 1,952,388$ (est. net oper. income)

(c) $\dfrac{\$\ 1,952,388}{\$47,723,162} = 4.1\%$ rate of return

However, the $1,100,000 projected loss would generate income tax deductions of roughly 50%, increasing the numerator of fraction (c) from $1,952,388 to $2,501,688, and the rate of return to 5.2%. The NEES brief relies on the 4.1% figure, but NEES has not challenged the Commission's recalculation.

The 1959 rates of return for the comparable nonaffiliated Massachusetts companies were as follows:

|  | Percent |
|---|---|
| Berkshire Gas | 5.2 |
| Brockton-Taunton Gas | 6.1 |
| Fall River Gas | 6.2 |
| Haverhill Gas | 6.8 |
| Lowell Gas | 7.9 |
| Springfield Gas | 6.4 |
| Worcester Gas | 4.5 |

(Resp. Ex. 117; R. 1436.)

by differences in capital structure, management, market position, and other factors. But it by no means follows that the Commission's comparisons are for that reason irrelevant to the determination whether a projected loss of economies is so important as to cause a serious impairment of the separated system. It was well within the range of the Commission's administrative discretion to use the loss ratios, as it did, "as a guide in adjudicating the pending case." *Philadelphia Co.*, 28 S. E. C. 35, 50, n. 24. The Commission in its expert judgment may so employ evaluative factors it considers relevant.[14]

Indeed, NEES apparently recognized that its burden to establish that its situation comes within Clause A included the burden of showing that the projected loss of economies would be more serious for its separated system than the comparable level of losses in the other cases already decided by the Commission. Respondent attempted to prove that the gas system's distance from sources of supply gives it only a very narrow competitive advantage over oil as a fuel, and, further, that the system's growth potential is more limited by a lack of new housing expansion in the area serviced by the gas companies. As we shall see below, the Commission found that NEES had not made a case in either respect insofar as those matters bore on whether the projected loss of economies threatened serious impairment of the separated system.

## II.

The Commission's resort to data concerning the operations of the nonaffiliated Massachusetts gas companies was a response to NEES' argument, supported by the

---

[14] Although the parties are in dispute as to the validity of some of the data drawn from the previous cases, we do not consider it necessary to become involved in that controversy. Suffice it to say that we do not think the Commission in looking to the data for guidance exceeded the bounds of reason or administrative discretion.

Massachusetts Department of Public Utilities, that the projected loss of economies from separation of the gas system would require the gas companies to seek rate increases which might seriously impair or destroy any hope of a successful operation. Natural gas in 1959 enjoyed in New England the smallest price advantage over oil of any section of the country. The annual differential was $7 over oil for a typical New England house compared with $27 to $118 in favor of gas in the rest of the country.[15] NEES contended that the predicted rate increase would substantially or entirely eliminate the gas system's already narrow price advantage over oil competitors. The Commission's answer was to inquire about the economic health of the already nonaffiliated Massachusetts gas companies. The Commission found that these companies were apparently able to earn a fair return although not enjoying the supposed advantages of affiliation with electric utilities; and it could find no evidence that they did not face the same competitive conditions as NEES.[16] The Commission found further that, despite NEES' insistence that its market conditions differed from the nonaffiliated companies because of relatively stagnant franchise areas offering less sales growth,[17] there was no evidence that this would pre-

---

[15] Gas to New England was piped all the way from Texas, whereas oil was shipped in by tanker. NEES estimated the average home heating cost to be $166 for gas, $173 for oil; and it was in residential space heating that NEES found its chief market.

[16] NEES calculated the composite rate of return for its gas system at 6.6% for 1958 and 6.4% for 1959. (Resp. Ex. 114; R. 1431.) The average for seven comparable independents was 6.3% in 1958 and 5.9% in 1959. (Resp. Ex. 117; R. 1436.)

[17] NEES cites as prime evidence in this regard the testimony of Robert Cahal, an Ebasco marketing consultant who had to some extent analyzed the marketing conditions NEES faced. The substance of his testimony was that (a) gas and oil are highly competitive in the State, with oil being well entrenched in many areas

vent the separated gas system—which would emerge as the second largest independent in the State—from competing as effectively as the smaller independents who had long held their own. Finally, the Commission noted that after severance the gas system's operating ratio would be more favorable or only slightly higher than the ratios of nine independents and therefore concluded that it "would be entering the realm of speculation at this time to assume that rate increases would ensue from severance." 41 S. E. C., at 899.[18]

The Court of Appeals rejected the comparison of these operating ratios, again on the ground that such ratios fail to take account of special characteristics of individual companies. The court observed that since all New England gas companies operated on a "small cushion . . .

so that the major source of growth has to be in new residence construction; (b) in Massachusetts growth is in the suburbs with towns proper being relatively stagnant; (c) gas companies are limited by their franchise area, prisoners of the characteristics of their particular communities; (d) the independents are not necessarily comparable with NEES because they may be in areas of higher growth; (e) independents having such areas are Haverhill, Lowell, Springfield, Worcester, Brockton-Taunton; all of them having growth greater (but unspecified as to degree) than any NEES gas company except Norwood.

The Commission noted, without comment, that the population increase in NEES' franchise areas between 1950 and 1960 was only 11% as compared with 18% in the areas of seven independents. 41 S. E. C., at 899, n. 23.

[18] The operating ratio is "the percentage of total operating revenue deductions (other than depreciation, amortization of conversion costs, and Federal income taxes) to total operating revenues." 41 S. E. C., at 899, n. 25. The ratio "affords a measure for determining the efficiency with which the enterprise is conducted and while its value is greater in comparing the year to year trend it has a limited use in comparing very similar enterprises." Moody's Public Utility Manual ix (1967). NEES' ratio was fixed at 76.41% and compared with the composite ratio of nine independents of 79.14%, as well as their median and mean ratios of 74.87% and 76.35% respectively. Individual ratios are cited at 41 S. E. C., at 899, n. 26.

[t]he significance of this is not negated by observing that non-NEES companies in Massachusetts seem to be surviving, for the focus must be on the specific characteristics of the NEES companies, the only ones affected by the Commission's order." 376 F. 2d, at 113. The court further held "irrelevant the comparison of operating ratios, since a business may operate relatively efficiently, yet at a level too low to attract investors." 376 F. 2d, at 114, n. 6. For the reasons already stated for our disagreement with the Court of Appeals' view of the Commission's use of other ratios, we disagree that this comparison was either irrelevant or outside the limits of the Commission's administrative discretion. The dissection and evaluation of an economic projection is a function Congress committed to the Commission, not the courts. A court may believe it would have done the job differently and better; but judicial inquiry must be addressed to whether what the Commission did is fatal to its ultimate conclusion that the holding company failed to carry its burden of showing a loss of "substantial" economies within the meaning of Clause A. In assessing NEES' forecast of the need for rate increases because of the projected loss of economies, it was proper for the Commission to consider the performance of other Massachusetts gas companies which were already operating independently. NEES was afforded every opportunity to sustain its burden of showing that the separated gas system would wither into critical health despite the contrary inferences suggested by the comparison made by the Commission. It cannot be a basis for finding error that the Commission found the attempt unpersuasive, given the gas system's size,[19] and the

---

[19] The Commission may properly regard size of operation to be a relevant factor. One of Congress' concerns in providing the exception involved here was to protect small companies likely to fail if separated from the parent holding company. Cf. *NEES I*, 384 U. S., at 181; *North Amer. Co.* v. *SEC*, 327 U. S. 686, 697. See also H. R. Rep. No. 1903, 74th Cong., 1st Sess., 68–71; S. Doc.

prognosis of efficiencies comparable to those achieved by the independents.[20]

## III.

The Commission conceived that the projected loss of economies would in some measure be offset by advantages realized by the separated system under the direction of "a management solely interested in and devoted to the gas operations . . . ." 41 S. E. C., at 901. NEES, again supported by the Massachusetts Department of Public Utilities, took the position that its operation of the companies had already achieved all possible benefits of interservice competition. The Commission found the argument unpersuasive, relying again on a comparison with the nonaffiliated Massachusetts gas companies. This was a comparison of the sales performance of the gas companies under NEES management with the sales performances of the independents. All seven of the comparable independents showed substantially higher gas sales and revenues per customer and lower costs to customers.[21] The Commission found unpersua-

---

No. 92, 70th Cong., 1st Sess., Pt. 72–A, at 831, 835. And NEES' size, especially given its relatively compact franchise area, is some indication of its competitive position.

[20] See n. 18, *supra,* and accompanying text.

[21] The breakdown was as follows:

| 1958— | NEES | Indep. |
|---|---|---|
| Sales, mcf/cust. | 44.2 | 78.8 |
| Revenues, cust. | $95.44 | $135.19 |
| Cost to customers, mcf. | $2.16 | $1.72 |
| 1959— | | |
| Sales, mcf/cust. | 51.5 | 83.7 |
| Revenues, cust. | $104.49 | $142.10 |
| Cost to customers, mcf. | $2.03 | $1.70 |

Equivalent data for the Norwood Gas Company, the NEES subsidiary asserted to have growth potential comparable to the independents, see n. 17, *supra,* were as follows (1958 and 1959 figures): Sales—51.8 and 60.4 mcf/customer; Revenues—$112.59 and $125.66/customer; Cost to customers—$2.17 and $2.08/mcf. 41 S. E. C., at 901, nn. 29–30. See R. 1446–1447, 1449–1450.

sive NEES' explanation that this was accounted for by the greater residential growth potential of the areas serviced by the independents.[22]

The Court of Appeals held that the test of "serious impairment" under Clause A already took account of offsetting benefits to be realized from separation and therefore "that done, the general judgment has no independent significance in an individual case." 376 F. 2d, at 115–116. Whatever the merit of the general premise, see *NEES I,* 384 U. S., at 184–185, we understand the Commission's finding to have been simply that the projected $1,100,000 loss of economies did not in fact take into account any offsetting benefits on the assumption that joint operation had already achieved the advantages of independence. See 41 S. E. C., at 900–901. The Commission's conclusion that NEES' assumption was not proved has support in the record and the Court of Appeals was not justified in rejecting it.

The judgment of the Court of Appeals is reversed and the case is remanded to that court with direction to enter a judgment affirming the Commission's order.

*It is so ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

Given the earlier decision of the Court in this case, *SEC* v. *New England Electric System,* 384 U. S. 176, which I continue to believe wrongly construed the statute but by which I consider myself bound, I join today's opinion of the Court.

---

[22] "[N]o specific demonstration of the existence or extent of such a causal relation was presented." 41 S. E. C., at 901. See also n. 21, *supra.*