( F. 2d )

VARIAN ASSOCIATES *v.* THE UNITED STATES (COMMERCE APPEAL No. 2, C.A.D. 953)

United States Court of Customs and Patent Appeals, February 6, 1969

*William D. Hall, Elliott I. Pollock, Kenneth L. King,* attorneys of record, for appellant.

*Edwin L. Weisl, Jr.,* Assistant Attorney General, *Morton Hollander, Stephen R. Felson* for the United States.

[Oral argument October 7, 1968 by Mr. Hal land Mr. Felson]

Before WORLEY, *Chief Judge*, RICH, SMITH, ALMOND, and BALDWIN, *Associate Judges*.

WORLEY, *Chief Judge*, delivered the opinion of the court:

■ Varian Associates (Varian) appeals from a decision of the Secretary of Commerce [1] approving an application of Illinois State University (ISU) for duty-free entry of a Hitachi Perkin-Elmer nuclear magnetic resonance (NMR) spectrometer which ISU proposed to purchase from the Japanese manufacturer.

The claim for free entry was made pursuant to Item 851.60, Tariff Schedules of the United States (TSUS), under the Educational, Scientific and Cultural Materials Importation Act of 1966; 80 Stat. 897 (898), 19 USC 1202, Schedule 8, Part 4, Headnote 6.[2] That item reads:

Articles entered for the use of any nonprofit institution, whether public or private, established for educational or scientific purposes:

  851.60 Instruments and apparatus, if no instrument or apparatus of equivalent scientific value for the purposes for which the instrument or apparatus is intended to be used in being manufactured in the United States (see headnote 6 to this part) _____    Free

---

[1] The notice of the decision is signed by the Director, Office of Scientific and Technical Equipment. Business and Defense Services Administration, Department of Commerce.

[2] The pertinent portions of Headnote 6 state:

6. * * *.

(b) An institution desiring to enter an article under item 851.60 shall make application therefor to the Secretary of the Treasury including therein (in addition to such other information as may be prescribed by regulation) a description of the article, the purposes for which the instrument or apparatus is intended to be used, the basis for the institution's belief that no instrument or apparatus of equivalent scientific value for such purposes is being manufactured in the United States, and a statement that either the institution has already placed a bona fide order for the instrument or apparatus or has a firm intention, in the event of favorable action on its application, to place such an order on or before the final day specified in paragraph (d) of this headnote for the placing of an order. If the application is made in accordance with the applicable regulations, the Secretary of the Treasury shall promptly forward copies thereof to the Secretary of Commerce and to the Secretary of Health, Education, and Welfare. * * *

(c) Upon receipt of the application the Secretary of Commerce shall, by publication in the Federal Register, afford interested persons and other Government agencies reasonable opportunity to present their views with respect to the question whether an instrument or apparatus of equivalent scientific value for the purposes for which the article is intended to be used is being manufactured in the United States. After considering any views presented pursuant to this paragraph, including any written advice from the Secretary of Health, Education, and Welfare, the Secretary of Commerce shall determine whether an instrument or apparatus of equivalent scientific value to such article, for the purposes for which the instrument or apparatus is intended to be used, is being manufactured in the United States. Each finding by the Secretary of Commerce under this

The jurisdiction of this court is specified in 28 USC 1544 as follows:

██ The Court of Customs and Patent Appeals shall have jurisdiction to review, *by appeal on questions of law only*, findings of the Secretary of Commerce under headnote 6 to schedule 8, part 4, of the Tariff Schedules of the United States (relating to importation of instruments or apparatus). [Emphasis supplied.]

ISU filed its application [3] accompanied by an addendum and an additional descriptive paper designated "Specifications for the Purchase of a Nuclear Magnetic Resonance Spectrometer." The reasons set out in the application why the Varian instrument is not the scientific equivalent of the Japanese article included the following:

2. Variable temperature work is planned—particularly low temperature studies of small chemical shift temperature coefficients, and thermodynamic and kinetic studies of conformational changes *which require the best* available range, stability, and determination of sample temperature. The Perkin Elmer R–20 specifications include the range of —100°C to 200°C, automatically controlled, without loss of resolution, stable to within ±.5° and precisely determinable at the sample due to an "in probe" thermocouple. The Varian variable temperature specifications offer temperature control at the sample of ±2°C, [4] and a calibration accuracy of ±3°C and a —60°C to 200°C range with spinning sample. [Emphasis supplied.]

In approving the application the Secretary stated:

No instrument or apparatus of equivalent scientific value to the foreign article, for the purposes for which such article is intended to be used, is being manufactured in the United States. REASONS: (1) The foreign article provides a sample temperature range from minus 100 degrees Centigrade to plus 200 degrees Centigrade. (See specifications for Hitachi Perkin-Elmer Model R–20 High Resolution Nuclear Magnetic Resonance Spectrometer.) The Varian Model HA–60IL–HR–60 has a temperature range from minus 60 degrees Centigrade to plus 200 degrees Centigrade. (Varian brochure V4341 and V4341–1.) We are advised by the Department of Health, Education, and Welfare (HEW) (memorandum dated September 28, 1967), that, in view of the purposes for which the

---

paragraph shall be promptly reported to the Secretary of the Treasury and to the applicant institution. Each such finding shall be published in the Federal Register, with a statement of the reasons therefor, on or before the ninetieth day following the date on which the application was made to the Secretary of the Treasury in accordance with applicable regulations.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) Within 20 days after the publication in the Federal Register of a finding by the Secretary of Commerce under paragraph (c) of this headnote, an appeal may be taken from said finding *only upon a question or questions of law* and only to the United States Court of Customs and Patent Appeals—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(ii) by a person who, in the proceeding which led to such finding, represented to the Secretary of Commerce in writing that he manufactures in the United States an instrument or apparatus of equivalent scientific value for the purposes for which the article to which the application relates is intended to be used. [Emphasis supplied.]

[3] The application was certified correct under penalty of law (18 USC 1001).

[4] As Varian pointed out in its comments, referred to below, the Varian specifications actually set out the temperature control of the sample as ±1°C, *not* ±2°C.

foreign article is intended to be used, the difference in temperature range is significant. (2) The foreign article provides a means for controlling the temperature within plus or minus 0.5 degree Centigrade whereas the Varian Model HA–60IL–HR–60 provides a means for controlling the temperature within plus or minus 1 degree Centigrade. We are advised by the National Bureau of Standards (memorandum dated October 20, 1967) that "the difference between ±1.0°C and ±0.5°C is such as to affect significantly the capability to perform certain experiments."

For the foregoing reasons, we find that the Varian Model HA–60IL–HR–60 is not of equivalent scientific value to the foreign article for the purpose for which such article is intended to be used.

Varian filed comments before the Secretary opposing the application, asserting that it manufactured apparatus which is of equivalent scientific value to the proposed import. Those comments raised two issues, i.e., whether the Varian apparatus performs in the same temperature range, and whether it has the same temperature stability as the Japanese equipment. Here Varian argues the same questions, along with other contentions not raised below.

We think it clear that those contentions made here for the first time cannot be considered by us. It is firmly established that a court reviewing the action of an administrative agency does not consider issues raised by the party seeking review which could have been raised before the agency but were not. *Unemployment Compensation Commission* v. *Aragon*, 329 U.S. 143 (1946); *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952). That principle governs here since Varian's new arguments could, and should, have been raised before the Secretary.

As to the matters properly before us, ▆ we have set out the statute which gives us jurisdiction to review the findings of the Secretary "on questions of law only." Such review of the findings here is limited to determining whether the administrative decision is supported by substantial evidence. *In re Von Clemm*, 43 CCPA 56, CAD 609 (1955); *Universal Camera Corp.* v. *National Labor Relations Board*, 340 U.S. 474 (1951); *Securities and Exchange Commission* v. *New England Electric System*, 390 U.S. 207, 211 (1968).

With respect to the Secretary's findings that the domestic instrument does not match the temperature characteristics of the Japanese article, Varian points out that it stated in its comments regarding the application that the temperature range of its instrument is from −120°C to 200°C and that its "temperature control specification * * * is ±1°C, and in a typical operation, more nearly ±½°C." However, a brochure which Varian submitted with its comments has the temperature range printed therein as "−60°C to +200°C" at two locations with the figure "−60°C" crossed out and the figure "−120° C" substituted by hand at only one of the locations. The printed bro-

chure sets out the temperature control characteristic as $\pm 1°C$ at the sample contrary to its assertion relative to $\pm\frac{1}{2}°C$ in its comments as cited above, and no change or correction was made in that item.

We are satisfied that such evidence must be accepted under the present circumstances as substantial support for the finding that the Varian apparatus has a temperature rnge of but $-60°C$ to $200°C$ rather than one extending from $-100°C$ or $-120°C$ to the same upper limit. As to the finding relative to the "temperature control specification," the evidence is substantially stronger since the very statement relied on to prove the $\pm\frac{1}{2}°C$ characteristic is but an equivocal modification of the direct statement that the specification is $\pm 1°C$.

Turning to the Secretary's finding that Varian's apparatus is not the scientific equivalent of the Japanese apparatus for the "purpose for which such article is intended to be used," ISU's reason No. 2, quoted above, states that the variable temperature studies planned by it "require the best available range, stability, and determination of sample temperature." Also pertinent to the finding is the memorandum of the National Bureau of Standards referred to by the Secretary, which states:

* * * The applicant intends to use the foreign article for low temperature studies of small chemical shift temperature coefficients as well as a general research tool and as a classroom training device. The only comparable domestic article known to us is the Varian HA–60–IL. On the basis of general usage the domestic instrument is scientifically equivalent to the foreign article. However, on the basis of the applicant's need for low temperature operation and resolution, we find the foreign instrument's low temperature control of $\pm 0.5°C$ and resolution of 1 in $10^{-8}$ (0.6 Hz for protons) to be pertinent characteristics.

Varian in its letter opposing the granting of duty free status for the applicant states that their temperature control is "nearly" $\pm\frac{1}{2}°C$. However, in its response to the applicant's request for bids Varian offered an instrument that would perform according to the specification in brochure V 4341 and V 4341–1. The brochure lists the temperature that can be maintained as $\pm 1°C$. We find the difference between $\pm 1.0°C$ and $\pm 0.5°C$ is such as to affect significantly the capability to perform certain experiments.

We find therefore that a pertinent characteristic offered by the foreign manufacturer is not offered by the domestic manufacturer. The instruments are not scientifically equivalent for the purpose for which the foreign instrument is being bought.

Likewise significant is the memorandum of the Public Health Service of the Department of Health, Education and Welfare, referred to in the decision of the Secretary. That document states:

It is the Committee's opinion that the planned low temperature research studies at Illinois University involving temperature coefficients of small chemical shifts and thermodynamic and kinetic conformational changes, establish as pertinent characteristics the range, stability and accuracy of measurement of temperature.

The foreign article has a sample temperature range of —100° to +200°C stable to ±0.5°C, measured with a themocouple. The domestic article has a temperature range of —60° to +200°C, controlled to ±1.0°C (calibration accuracy of ±3°C), measured with a resistance thermometer. The Committee believes that in the pertinent characteristics cited, the foreign and domestic articles are not scientifically equivalent.

Considering the record in light of those reports from agencies which, unlike this court, must be credited with expertise in the field, we conclude that there is substantial evidence to show that the requirement of a sample temperature range of —100°C to +200°C, stable to ±.5°C, is material to the purpose for which ISU has stated it intends to use the NMR spectrometer and to support the ultimate finding of the Secretary that the Varian apparatus is not of equivalent scientific value to the Japanese apparatus for that purpose.

Since we find no error of law in the Secretary's decision, it is *affirmed*.

Judge SMITH participated in the hearing of this case but died before a decision was reached.