CITY OF HOLYOKE GAS &
ELECTRIC DEPARTMENT,
et al., Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent,

Northeast Utilities and Northeast Utilities
Service Company, State of New Hamp-
shire and the New Hampshire Public
Utilities Commission, Littleton Electric
Light & Water Department, State of
Connecticut Department of Public
Quality Control, Intervenors.

Nos. 91–1001, 91–1091, 91–1092,
91–1132 and 91–1220.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 14, 1991.

Decided July 24, 1992.

As Amended Aug. 31, 1992.

David J. Bardin, with whom Marilyn D. Sonn and Steven R. Miles, Washington, D.C., for City of Holyoke Gas and Elec. Dept., Mary Anne Sullivan, Washington, D.C., and Mitchell M. Tannenbaum, Augusta, Me., for Maine Public Utilities Com'n, Harvey L. Reiter and Kathleen L. Mazure, Washington, D.C., for Vermont Department of Public Service, Alan J. Roth and Scott H. Strauss, Washington, D.C., for Massachusetts Mun. Wholesale Elec. Co., and John P. Coyle, Washington, D.C., for Boylston Mun. Light Dept., et al. were on the joint brief, for petitioners in 91–1001, 91–1091, 91–1092, 91–1132, and 91–1220.

Katherine Gresham, Asst. Gen. Counsel, SEC, with whom James R. Doty, Gen. Counsel, Leslie E. Smith, Special Counsel, and Paul Gonson, Sol., Washington, D.C., were on the brief for respondent in all cases.

Allan B. Taylor, with whom John B. Keane, Hartford, Conn., for Northeast Utilities and Northeast Utilities Service Co., and Harold T. Judd, Concord, N.H., for the State of New Hampshire and New Hampshire Public Utilities Com'n were on the joint brief for intervenors in 91–1001, 91–1091, 91–1132, and 91–1220. Glen L. Ortman, Washington, D.C., also entered an appearance for intervenor.

Donald R. Allen, John P. Williams, and John P. Coyle, Washington, D.C., were on the brief for intervenor Littleton Electric Light & Water Dept. in 91–1001 and 91–1092.

Robert S. Golden, Jr., Hartford, Conn., also entered an appearance for intervenor State of Connecticut Dept. of Public Utility Control in 91–1001 and 91–1220.

Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Nine municipal utilities and three state agencies (hereinafter collectively the Munis) petition for review of the decision of the Securities and Exchange Commission to approve the acquisition of the Public Service Company of New Hampshire (PSNH) by Northeast Utilities. The Munis argue that the SEC committed numerous errors in approving the acquisition; for the reasons set out below we reject their arguments and deny the petitions for review.

## I. BACKGROUND

PSNH provides retail or wholesale electric service to approximately 75% of the population of New Hampshire and has a 35.6% ownership interest in the nuclear power plant at Seabrook, New Hampshire. In 1988 the Company filed a voluntary petition in bankruptcy court for reorganization under chapter 11 of the Bankruptcy Code. Two years later the bankruptcy court approved a reorganization plan under which Northeast Utilities, a large electric utility holding company, would acquire PSNH. *In re Public Serv. Co. of New Hampshire*, 114 B.R. 804 (Bankr.D.N.H.1990). Northeast then petitioned various regulatory agencies, including the SEC, the Federal Energy Regulatory Commission, and the Nuclear Regulatory Commission, for approval of the acquisition, and gave premerger notification of the acquisition to the Antitrust Division of the Department of Justice and the Federal Trade Commission.

The Munis intervened before the SEC to oppose Northeast's application to acquire PSNH (and to issue securities necessary to finance the acquisition). The Munis argued that the acquisition was contrary to the public interest on a number of grounds, including that the likely benefits of the merger did not exceed its likely costs, that the merger would have an anticompetitive effect in the New England markets for the generation and transmission of bulk elec-

tric power, that Northeast's corporate structure was unduly complex, and that Northeast's earning power would be insufficient to satisfy the financial obligations that it would incur in acquiring PSNH. The Munis requested an evidentiary hearing before the SEC in order to pursue these claims.

While the SEC considered the positions of the parties before it, the FERC was conducting its own proceeding regarding the proposed acquisition. Two of the issues contested in the FERC proceeding were among those also put before the SEC—whether the likely benefits of the merger exceed its likely costs and whether the merger would have an anticompetitive effect in the relevant markets. After an extensive evidentiary hearing, the Administrative Law Judge hearing the FERC case released an initial decision on December 20, 1990. *Northeast Utils. Serv. Co.*, 53 F.E.R.C. ¶ 63,020 (1990). The ALJ found that the likely benefits of the acquisition do exceed its likely costs, slip op. at 7–15, but that the acquisition would give Northeast so large a share of the bulk power generation and transmission markets as to raise a concern that Northeast might be able to behave anticompetitively, *id.* at 15–24. The ALJ recommended approval of the acquisition nonetheless, subject to certain conditions designed to prevent Northeast from engaging in anticompetitive practices after the merger. *Id.* at 24–51.

The following day the SEC issued its own order approving the acquisition. *Northeast Utils.*, Holding Co. Act Rel. No. 35–25221, 47 S.E.C. Docket 1887 (Dec. 21, 1990) (SEC Order). Contrary to the FERC, the SEC found that the acquisition would have no anticompetitive effect in the relevant markets. Slip op. at 40. Like the FERC ALJ, the SEC determined that the likely benefits of the merger exceed its likely costs, *id.* at 51–53; the SEC also held that Northeast's corporate structure was not unduly complex, *id.* at 45–50, that Northeast's post-merger earnings would be sufficient to satisfy the financial obligations that it would incur in acquiring

PSNH, *id.* at 28–31, and that no hearing was necessary, *id.* at 59–69.

The Munis filed petitions for rehearing with the SEC. In a Supplemental Order the SEC changed its position on one issue, holding that the acquisition indeed "raises the potential for anticompetitive behavior." *Northeast Utils.*, Holding Co. Act Rel. No. 35–25273, 48 S.E.C. Docket 776, slip op. at 5 (Mar. 15, 1991) (Supplemental Order). Recognizing the FERC's greater expertise with the operational issues involved, however, the Commission deferred to the FERC to frame the conditions necessary in order to minimize the risk to competition. *Id.* at 6–9. The SEC noted that if the conditions imposed by the FERC were inadequate to prevent Northeast from engaging in anticompetitive behavior after the acquisition, the SEC could reopen its proceeding and "rescind or further condition its approval" of the acquisition. *Id.* at 9 n. 15, citing the Public Utility Holding Company Act of 1935 (PUHCA) § 20(a), 15 U.S.C. § 79t(a). The SEC also pointed out that the allegedly undue complexity of Northeast's corporate structure was unrelated to its acquisition of PSNH, *id.* at 11–12; again rejected the Munis' other arguments and denied their request for an evidentiary hearing, *id.* at 9–14; and affirmed its earlier order approving the acquisition, *id.* at 15.

Some time after the SEC released it Supplemental Order, the FERC accepted the recommendation of its ALJ to approve the acquisition (modifying some of the conditions to be imposed). *Northeast Utils. Serv. Co.*, 56 F.E.R.C. ¶ 61,269 (1991), *reh'g denied,* 58 F.E.R.C. ¶ 61,070 (1992), petitions for review pending sub nom. *Northeast Utilities Service Co., et al. v. FERC,* Nos. 92–1165, et al. (1st Cir.). The NRC has also since approved the acquisition. 57 Fed.Reg. 24,064 (1992). Neither the FTC nor the Department of Justice took any action to stop the merger under the antitrust laws. *See* 56 Fed.Reg. 7710 (1991).

## II. ANALYSIS

Seeking review of the SEC decision, the Munis argue that the Commission erred in (1) finding that the likely costs of the acquisition exceed its likely benefits, (2) deferring to the FERC the question of anticompetitive effect of the acquisition, (3) refusing to order Northeast to simplify its corporate structure, (4) finding that the earning power of the post-merger Northeast will be sufficient to satisfy the financial obligations that Northeast will incur in acquiring PSNH, and (5) denying the Munis' requests for an evidentiary hearing. We consider each argument in turn.

### A. The Benefits and Costs of the Acquisition

Under PUHCA § 10(c)(2), 15 U.S.C. § 79j(c)(2), the SEC may not approve an acquisition "unless the Commission finds that such acquisition will serve the public interest by tending towards the economical and efficient development of an integrated public-utility system." As the SEC interprets § 10(c)(2), the agency is required to withhold its approval if the likely costs of the acquisition exceed its likely benefits. *See* SEC Order, slip op. at 51–53. In other words, the SEC looks for a net social gain.

The Commission adopted the estimate of costs and benefits that Northeast submitted to it. Because that estimate is supported by substantial evidence in the record, we do not disturb it. *See SEC v. New England Elec. Sys.,* 390 U.S. 207, 211, 88 S.Ct. 916, 920, 19 L.Ed.2d 1042 (1968) (judicial review of Commission's economic forecasting is "necessarily ... limited").

The Commission estimates that the merger will benefit the public by saving all electric utilities in New England almost $800 million. (This and all other dollar amounts are net present values.) First, under the acquisition agreement Northeast will take over management of the Seabrook nuclear power plant. The SEC anticipates that Northeast will be able to improve the plant's efficiency sufficiently to save the owners of Seabrook a total of $527 million. (Based upon its post-merger ownership share of the Seabrook plant, Northeast will realize $209 million of that saving; the remaining $318 million will accrue to the other New England electric utilities that

are part owners of the plant.) Second, the SEC estimates that the merged Northeast–PSNH will save an additional $264 million from various other "efficiencies," "synergies," and administrative savings. Thus, the acquisition entails a total savings of $791 million ($527 million plus $264 million) and no significant offsetting costs.

The SEC also points to another, unquantified benefit of the acquisition—assisting PSNH to emerge from bankruptcy. Although the SEC recognizes that PSNH could emerge from bankruptcy independent of Northeast, the Commission predicts that an independent PSNH would be in a weak financial position. According to the SEC, only the merger with Northeast would "provid[e] PSNH with the management capacity and financial resources to make it viable again." Supplemental Order, slip op. at 13 n. 25. The Munis challenge that finding and argue that the SEC erred in attributing to the acquisition the benefit of PSNH's emergence from bankruptcy. Even if they are right, however, the Commission's error would be immaterial in light of the overwhelming excess of other benefits ($791 million) over the costs (0) still attributable without objection to the acquisition. *Cf.* 5 U.S.C. § 706 (harmless error).

The Munis also point out that one effect of the acquisition will be to reallocate $364 million in costs from Northeast and PSNH to other New England utilities. The Munis, Northeast, and PSNH, like virtually every electric utility in New England, are members of the New England Power Pool (NEPOOL), "a comprehensive interconnection and coordination arrangement," *Municipalities of Groton v. FERC*, 587 F.2d 1296, 1298 (D.C.Cir.1978), that pools the generating capacity in the region. Under the NEPOOL Agreement, each NEPOOL member has a payment obligation that is determined in part by its annual peak load requirement. Because the peak load requirements of Northeast and PSNH occur at different times of year (and because of other intricacies of the NEPOOL Agreement) the acquisition will cause responsibility for a portion of NEPOOL expenses to be reallocated from the merging companies to other members of the pool. (Of course

this shift in the incidence of private costs has no net effect on the social cost-benefit analysis; the gain to Northeast is exactly offset by the loss to others.)

From the private perspective of the non-merging New England utilities, the $364 million in NEPOOL costs shifted to them is offset only to the extent of their $318 million share of the savings associated with the change of management at Seabrook, leaving them with an aggregate net loss of $46 million. The Munis argue that despite the $791 million excess of social benefits over total costs attributable to the acquisition, there is no reason "that *non*-merging utilities and their customers (rather than [Northeast]) should bear costs of $46 million in order to assist PSNH [to] emerge from bankruptcy" and Northeast to save hundreds of millions of dollars. Presumably—although the Munis are none too clear on this point—their complaint is that the SEC failed to impose a condition holding them harmless from losses arising from the acquisition. Moreover, the Munis assert that even if approval of the merger without such a "hold harmless" condition might under some circumstances be justified, the SEC failed to provide any reasoned explanation for its decision to approve the acquisition without such a condition.

■    There is a simple explanation, however, for the SEC's failure to impose a hold harmless condition upon its approval of the merger: The Munis never asked for one. The Munis primarily argued to the Commission that Northeast's estimate overstated the likely gains and understated the likely costs of the acquisition. The Munis point to only one place in the record where they even mentioned the $46 million net loss that the non-merging utilities would incur. That entire passage reads: "[Northeast's] own estimates of savings and benefits acknowledge that the balance of NEPOOL (other than [Northeast] and PSNH) will incur a net loss of at least $46 million due to the merger." This lone statement of fact hardly constitutes a request, much less an argument, for a hold harmless condition. Having failed to ask the SEC for a condi-

tion protecting them from any adverse effect of the acquisition, the Munis cannot now complain that the SEC failed to impose such a condition. PUHCA § 24(a), 15 U.S.C. § 79x(a) ("No objection to the order of the Commission shall be considered by the [reviewing] court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do").

## B. AntiCompetitive Effect

▪ Under PUHCA § 10(b)(1), 15 U.S.C. § 79j(b)(1), the SEC may not approve a transaction that "will tend towards ... the concentration of control of public-utility companies, of a kind or to an extent detrimental to the public interest or the interest of investors or consumers." In conducting its § 10(b)(1) inquiry, the SEC recognizes that it must "consider [the] possible anticompetitive effects" of a proposed acquisition. SEC Order, slip op. at 39; *see also Municipal Elec. Ass'n v. SEC*, 413 F.2d 1052, 1056–57 (D.C.Cir.1969) (§ 10(b)(1) inquiry "must take significant content" from "the federal anti-trust policies").

The Munis argued to the SEC that the acquisition would be anticompetitive because it would give Northeast substantial control over the uncommitted generating capacity in New England and complete control over key transmission corridors. In its Supplemental Order the SEC agreed, finding that the control that the post-acquisition Northeast would have over "both transmission lines and surplus bulk power raises the potential for anticompetitive behavior." Supplemental Order, slip op. at 5.

The SEC decided to defer to the FERC, however, in the delicate matter of crafting conditions designed to preclude Northeast from engaging in post-merger anticompetitive behavior. The SEC explained:

Both the [SEC under the PUHCA] and the FERC [under the Federal Power Act] have statutory responsibilities with respect to the anticompetitive consequences of mergers in the public-utility industry....

Because the FPA is directed at operational issues, including transmission access and bulk power supply, the expertise and technical ability for resolving the types of anticompetitive issues raised by the petitioners lie principally with the FERC. When the [SEC], in determining whether there is an undue concentration of control, identifies such issues, we can look to the FERC's expertise for an appropriate resolution of these issues.

*Id.* at 6–8.

In order to assure coordination of their orders, the SEC "condition[ed] [its] approval of the Acquisition upon the issuance by the FERC of a final order approving the merger." *Id.* at 8–9. Moreover, the SEC expressly noted that if the Munis were not satisfied by the conditions ultimately imposed by the FERC, they could then ask the SEC to use its "authority to rescind or further condition its approval" under PUHCA § 20(a), 15 U.S.C. § 79t(a). Supplemental Order, slip op. at 9 n. 15.

The Munis now argue that the SEC's deference to the FERC was improper, an "abdicat[ion] [of the SEC's] statutory duty to make a reasoned finding on the competitive issues presented before it and to administer its own statute." This is surely an overstatement, however: The SEC made precisely the finding—that the merger would raise the potential for anticompetitive behavior by Northeast—that the Munis sought. Perhaps the Munis mean to argue only that the SEC erred in deferring to the FERC in the first instance to propose conditions designed to preclude any anticompetitive effect that the merger would otherwise have.

▪ Although the SEC may not rely upon the FERC's concurrent jurisdiction over an acquisition as a reason to shirk its own statutory mandate to determine the anticompetitive effect of that transaction, *see, e.g., Municipal Elec. Ass'n*, 413 F.2d at 1059–60, it does not follow that the SEC must pretend that it is the only agency addressing the issue when it is not; that would only lead it to conduct a wasteful, duplicative proceeding. Rather, when the SEC and another regulatory agency both have jurisdiction over a particular transaction, the SEC may "watchfully defer[ ]" to

the proceedings held before—and the result reached by—that other agency. *Wisconsin's Environmental Decade v. SEC*, 882 F.2d 523, 527 (D.C.Cir.1989).

The Munis concede that "[w]atchful deference seems permissible" but claim that the SEC's deference here was not sufficiently alert. They point out that in *Environmental Decade* the SEC deferred to regulatory proceedings that were already complete—enabling the SEC to evaluate the result reached by that other agency (in light of the SEC's own statutory mandate) before deciding to defer—whereas here the SEC deferred to the then still unknown result of an on-going proceeding before the FERC. Far from being watchful, the Munis argue, this deference was "blind and absolute."

The Munis overlook, however, that the SEC did not terminate its oversight of the proposed acquisition with the Supplemental Order they criticize so colorfully: When it deferred to the FERC, the SEC expressly referred to its "on-going authority" under PUHCA § 20(a), 15 U.S.C. § 79t(a), "to rescind or further condition its approval" of the acquisition. Supplemental Order, slip op. at 9 n. 15. The SEC in effect advised the Munis that if they believed that the order of the FERC was deficient in any way, they could return to the SEC and ask it to impose additional conditions upon the acquisition (or even to disapprove it). Thus, the SEC did not abdicate responsibility or otherwise err in deferring provisionally to the FERC to craft the competitive conditions to be placed upon the acquisition.

## C. Northeast's Corporate Structure

■ Under PUHCA § 10(c)(1), 15 U.S.C. § 79j(c)(1), the SEC must reject a proposed acquisition that is "detrimental" to its ability to "carry[ ] out ... the provisions" of PUHCA § 11, 15 U.S.C. § 79k. Section 11(b)(2) of the Act provides that the Commission shall

require ... that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to en-

sure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure ... of such holding-company system.

In this connection, the Munis argue first that the SEC should have rejected the proposed acquisition on the ground that Northeast's pre-merger corporate structure is unduly complex. Because, as the SEC noted, the Munis' allegation of undue complexity is unrelated to the merger, however, *see* Supplemental Order, slip op. at 11–12, the Commission refused to resolve that issue in the present proceeding. We see no error in that. We note, however, that nothing in the two SEC orders under review today precludes the Munis from challenging Northeast's corporate structure in another proceeding before the Commission.

The Munis also argue that because the post-merger Northeast will need to rely upon income from its affiliates in order to pay the dividends on the securities it will issue to finance the acquisition of PSNH, the acquisition will in fact make later simplification of Northeast's corporate structure more difficult. The Munis never raised this argument to the SEC, however, and so we do not consider it. PUHCA § 24(a), 15 U.S.C. § 79x(a).

## D. The Issuance of Securities

■ Under PUHCA § 7(d)(2), 15 U.S.C. § 79g(d)(2), the SEC may not approve a utility company's request to issue a security if "the Commission finds that ... the security is not reasonably adapted to the earning power of the [issuer]." In order to finance the acquisition of PSNH, Northeast sought SEC approval to issue various classes of securities, including common stock to be issued by the new subsidiary of Northeast that would acquire PSNH's assets, warrants to be issued to PSNH's current shareholders, and (when those warrants are exercised) additional common stock in Northeast. The Munis assert that Northeast's post-merger earnings will be insufficient to service the dividends it proposes to pay on its common stock.

This is a matter squarely within the expertise of the SEC. The Commission received extensive evidence, including expert opinions, from both sides. The SEC analyzed the submissions and found that the proposed securities are "reasonably adapted to the earning power of" Northeast. There is substantial evidence in the record to support that finding.

As a fall-back position, the Munis' complain that the SEC failed to address the contrary opinion of one of their experts and therefore did not "explain[ ] its finding with a reasoned discussion of the facts necessary to support such a finding." The SEC explained that it expects Northeast to have sufficient earning power to pay the proposed dividend on its common stock, in part because of a rate increase approved by the New Hampshire Public Utility Commission for the former customers of PSNH and in part because of "the existing health of the Northeast system." SEC Order, slip op. at 31. That explanation may be spare but it is not inadequate, much less "intolerably mute." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970). The SEC's failure to respond to every assertion made by every expert in a voluminous record does not render the Commission's decision arbitrary and capricious.

*E. Request for a Hearing*

 The Munis argue that the Commission erred in denying their requests for an evidentiary hearing. The SEC must grant a hearing request, of course, only if "the ultimate decision will ... be enhanced or assisted by the receipt of evidence." *City of Lafayette v. SEC,* 454 F.2d 941, 953 (D.C.Cir.1971), *aff'd sub nom. Gulf States Utils. Co. v. FPC,* 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); *see also Association of Mass. Consumers v. SEC,* 516 F.2d 711, 715 (D.C.Cir.1975).

We review for abuse of discretion the SEC's refusal to hold a hearing. *Id.; cf. Vermont Dep't of Public Serv. v. FERC,* 817 F.2d 127, 140 (D.C.Cir.1987). Before the SEC issued the orders under review, the parties had submitted to the agency voluminous documentation of their positions; moreover, the FERC had compiled an extensive evidentiary hearing record, the relevant portions of which the parties submitted to the SEC. Under these circumstances, we find no abuse of discretion in the SEC's determination that a hearing would not have improved its decisionmaking process.

III. CONCLUSION

The Munis raise other arguments that do not warrant treatment in a published opinion. For the reasons given above, their petitions for review are

*Denied.*