Matter of the **UNITED CORPORATION.**

**Appeal of Herbert M. DIAMOND et al.,**
**Appellants in No. 11627.**

**Appeal of GENERAL PROTECTIVE COMMITTEE FOR THE HOLDERS OF OPTION WARRANTS OF THE UNITED CORPORATION and Alfred A. Biddle, Appellants in No. 11645.**

**Nos. 11627, 11645.**

United States Court of Appeals
Third Circuit.

Argued Nov. 3, 1955.

Decided April 16, 1956.

Thomas Reath, Philadelphia, Pa. (M. Quinn Shaughnessy, Washington, D. C.,

John Mulford, Philadelphia, Pa., on the brief, Drinker, Biddle & Reath, Philadelphia, Pa., on the brief), for appellants General Protective Committee and others.

Carlos L. Israels, New York City (Berlack, Israels & Liberman, New York City, Lawrence Greenapple, New York City, on the brief), for appellants Diamond et al.

Richard Joyce Smith, New York City (William S. Potter, Berl, Potter & Anderson, Wilmington, Del., William T. Farley, New York City, on the brief), for appellee United Corp.

William H. Timbers, Washington, D. C. (Thomas G. Meeker, Associate General Counsel, Frederick Zazove, Special Counsel, Ellwood L. Englander, Attorney, Securities and Exchange Commission, Washington, D. C., on the brief), for Securities and Exchange Commission.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

These are appeals from an order of the district court for the District of Delaware enforcing certain provisions of a voluntary plan submitted by The United Corporation and approved by the Securities and Exchange Commission under Section 11(e) of the Public Utility Holding Company Act of 1935 ("Act"), 15 U.S.C.A. §§ 79 et seq., 79k(e).

We are concerned only with that phase of the district court's order which cancelled outstanding warrants of The United Corporation without compensation to the holders.[1]

Appeals, challenging the cancellation, have been taken to this court by the General Protective Committee for the Holders of Option Warrants of The United Corporation and Alfred A. Biddle (No. 11,645) and by Herbert M. Diamond, et al. (No. 11,627). This opinion covers both appeals.[2]

---

1. In re The United Corporation, D.C.1955, 128 F.Supp. 725.

2. Although in the opinion we refer to questions raised by "appellants," some of

■ The United Corporation is a holding company registered under the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C. § 79 et seq., and is, therefore, for the purposes of the Act, subject to the jurisdiction of the Commission. In 1943, the Commission directed that United cease to be a holding company and limit its corporate structure to a single class of common stock. United decided to comply with the Commission direction that it cease to be a holding company by transforming itself into an investment company. By the latter part of 1949, United, with the Commission's approval, had completed various steps in line with its proposed transformation into an investment company. In November, 1949, United submitted a further plan to complete its compliance with the 1943 order. The 1949 plan was amended in July, 1950, following which hearings on the plan were held. After certain modifications (not presently material), the Commission approved the plan which, among other things, provided for the cancellation of outstanding option warrants of The United Corporation, without compensation to the holders.[3]

Since, according to the Commission's order, cancellation was one phase of the plan which was to become effective only after enforcement by an appropriate United States District Court, the present application for enforcement was brought.[4]

Several arguments are advanced in support of the contention that the district court erred in approving and ordering enforcement of the cancellation. The first contention concerns the Commission's authority to approve and order changes in United's capital structure, which authority would extend to the cancellation of the warrants.

■ The Commission claims that by virtue of Section 11(b) (2) [5] of the Act, it has the authority to simplify the capital structure of a registered holding company and its subsidiaries, and since United is a registered holding company, the Commission had jurisdiction to order the cancellation. We think the Commission is correct.

■ In passing the Public Utility Holding Company Act, Congress was attempting to meet the problems and eliminate the evils that were connected with the public utility holding companies engaged in interstate commerce. To that end, Congress intended to compel the simplification of public-utility holding-company systems, and the elimination of such systems, except under such terms and conditions as were expressly provided in the Act. See Sec. 1(c).

As part of the plan to achieve these results, Congress, in Section 11(b) (1),

---

the questions were not raised by all appellants. Also, all section numbers refer to sections of the Public Utility Holding Company Act of 1935.

3. The plan submitted in November, 1949, had proposed that new five-year warrants to purchase common stock at $7 per share would be issued in exchange for the outstanding perpetual warrants which allowed purchase of common stock at $27.50 per share. One new warrant was to be issued for five old ones.

4. Before the present application was brought, the Commission's order was appealed to the Court of Appeals for the District of Columbia and to the Supreme Court, which held that review in the Court of Appeals was not proper prior to a suit for enforcement in the district court. See General Protective Committee, for Holders of Option Warrants of United Corp. v. S. E. C., 1954, 346 U.S. 521, 74 S.Ct. 261, 98 L.Ed. 339; Downing v. S. E. C., 1953, 92 U.S.App.D.C. 172, 203 F.2d 611. The Supreme Court's opinion also gives the details of other provisions of the plan and United's past actions under the Act.

5. The relevant part of § 11(b) (2) reads:
"(b) It shall be the duty of the Commission, as soon as practicable * * *:
"(2) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure * * *."

specified a desideratum that holding-company systems be limited in their operations to a single integrated public-utility system.[6] Section 11(b) (2) specified a further desideratum, namely the simplification of the corporate structure of a registered holding company and its subsidiaries.[7]

Compliance with the desired results of Sections 11(b) (1) and 11(b) (2) may be achieved by two routes. One is a procedure authorized in 11(b) (1) and 11(b) (2) whereby the Commission by order may require that designated steps be taken by a registered holding company or a subsidiary. The second method of compliance, under 11(e), is by a voluntary reorganization[8] which a registered holding company or a subsidiary proposed under a broad discretion which Congress left to management to determine how to bring their systems into compliance with 11(b) (1) and 11(b) (2). See General Protective Committee for Holders of Option Warrants of United Corp. v. S.E.C., 1954, 346 U.S. 521, 529, 74 S.Ct. 261, 98 L.Ed. 339.

United's method of complying with Section 11(b) was by way of proposing a voluntary reorganization. As part of the reorganization, United proposed to become an investment company. This step would necessarily mean that there would be nothing further for United to do so far as Section 11(b) (1) was concerned. Section 11(b) (1) requires limitations in the operations of holding-company systems. Obviously, if United chose to become an investment company, it would be more than satisfying Section 11(b) (1). See General Protective Committee for Holders of Option Warrants of United Corp. v. S.E.C., 346 U.S. at page 530, 74 S.Ct. at page 266, Congress

---

**6.** Aside from exceptions which are not material, § 11(b) (1) reads:

"(b) It shall be the duty of the Commission, as soon as practicable * * *:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system * * *."

**7.** Section 11(b) (2) also desired the elimination or dissolution of a registered holding company or any of its subsidiaries, see American Power & Light Co. v. S. E. C., 1946, 329 U.S. 90, 112–114, 67 S.Ct. 133, 91 L.Ed. 103, but we are concerned here only with the simplification feature of § 11(b) (2). We note also, in order to avoid confusion, that the simplification of corporate structures or the dissolution of companies was conditional upon a finding that the corporate structure or continued existence of a company unduly or unnecessarily complicated the structure, or, in other words, violated the standards set forth in the Act. See 329 U.S. at page 113, 67 S.Ct. at page 146. We are not at this point concerned with that condition. In this part of the opinion we are concerned with whether the Commission had the authority to simplify United's capital structure. Later we will discuss whether it properly exercised its authority, that is, whether it made a proper finding that a "complication" was present.

**8.** "(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. * * *" § 11(e).

certainly did not contemplate that a registered holding company had to remain a holding company forever, the elimination of holding companies having been explicitly mentioned as one of the purposes of the Act. See § 1(c).

The appellants apparently go a step further, however, and argue that becoming an investment company not only satisfies Section 11(b) (1), but also 11(b) (2). Thus, it is said, since becoming an investment company satisfies both 11(b) (1) and 11(b) (2), nothing further can be required of a registered holding company, once it files a plan to become an investment company, so long as it in good faith pursues that end with reasonable expedition. Accordingly, the Commission had no jurisdiction to compel a change in United's capital structure.[9] We cannot agree with the appellants. Athough one of the purposes of the Act was the elimination of holding companies, another purpose was the elimination of evils which had become part of the corporate structure of registered holding companies and their subsidiaries. Becoming an investment company will satisfy Section 11(b) (1), but it does not necessarily satisfy 11(b) (2), which requires the simplification of corporate structures. United was and is a registered holding company and, as such, clearly falls within the command of Section 11(b) (2).

There is nothing in Section 11(b) or elsewhere in the Act which says that the Commission cannot order simplification of the corporate structure of a registered holding company if the eventual result contemplated is an investment company.[10] Once United became a registered holding company, it came within the jurisdiction of the Commission and was subject to all requirements applicable to a registered holding company, including that requirement designed by Congress to eliminate evils which had become a part of holding-company systems. United would cease to be subject to requirements for *registered holding companies* only by an order of the Commission issued upon such terms and conditions as the Commission finds and "in such order prescribes as necessary for the protection of investors * * *."[11] § 5(d). No such order was issued by the Commission. The change in United's capital structure was, therefore, authorized.

9. It is clear that, since United was a registered holding company, the Commission could have compelled it to dissolve. Also, had the original intention been for United to remain a holding company, the Commission could have ordered the warrants cancelled and at some subsequent date ordered transformation into an investment company.

10. Appellants have pointed out that the legislative history, as found in Congressional committee reports (See Sen.Rep. No. 621, 74th Cong., 1st Sess.; House Rep. No. 1318, 74th Cong., 1st Sess.) indicates that holding companies were to choose either "(a) to turn themselves into investment trusts * * * or (b) to arrange or reduce their holdings in operating companies * * * so that each holding company will control the management of only a single system of operating companies." They say there was never the slightest suggestion that a holding company do both.

But the two alternatives mentioned above are desired results. The Committee Reports do not indicate that corporate structure could not be affected if a holding company chose the first alternative rather than the second, and we are not persuaded otherwise by the appellants' arguments concerning legislative history.

11. Under the Act, there is a difference between a *registered holding company* and a *holding company*. A *holding company* is a company which directly or indirectly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company, etc. § 2(a) (7).

A *registered holding company* is a *holding company* which has registered with the SEC. § 2(a) (12). Once a company becomes a *registered holding company*, it remains such until the Commission orders otherwise. § 5(d). Thus, a company does not cease to be a *registered holding company*, even though it is no longer a *holding company*, until the Commission issues its order.

But even though it had such authority, the Commission, by the terms of Section 11(b) (2), can only exercise its authority to remove those features in a corporate structure which "unduly or unnecessarily complicate the structure." This brings us to the next question raised on this appeal, and that is whether the outstanding warrants of United were such a complication.

The option warrants were perpetual and gave the holder the right to purchase common stock at $27.50 a share.[12] The Commission found that there was no reasonable expectation that the earnings and assets of United over the foreseeable future would be such that the market price of its common stock would increase to the extent needed to give the warrants a recognizable value. The Commission also found that the terms of the warrants were such that they conveyed an extremely tenuous right aside from what the future earnings and assets of the company might be. Accordingly, the Commission concluded that the warrants would be inherently deceptive to investors and perpetuate in the corporate structure useless and unnecessary complexities in contravention of Section 11 (b) (2). The appellants contend that the complication referred to in Section 11(b) (2) has no relationship to the public or to future investors and that the complication must relate to internal matters affecting the corporation or its security holders. To begin with, such an argument flies directly into the hard facts of Congressional concerns in passing the Public Utility Holding Company Act. Not even the wisdom of judicial notice is necessary to know that that Act was not passed to protect the holding-company systems. It was the public interest and the interests of investors and consumers, both actual and potential. In American Power & Light Co. v. S.E. C., 1946, 329 U.S. 90, at page 104, 67 S.

Ct. 133, at page 142, 91 L.Ed. 103, the Supreme Court, in discussing the meaning of terms in Section 11(b) (2), including the phrase "unduly or unnecessarily complicate," said:

" * * * Even standing alone, standards in terms of unduly complicated corporate structures and inequitable distributions of voting power cannot be said to be utterly without meaning, especially to those familiar with corporate realities. But these standards need not be tested in isolation. They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear. See Intermountain Rate Cases (United States v. Atchison, T. & S. F. R. Co.), 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408. From these sources—from the manifold evils revealed by the legislative investigations, the express recital of evils in § 1(b) of the Act, the general policy declarations of Congress in § 1(c), the standards for new security issues set forth in § 7, the conditions for acquisitions of properties and securities prescribed in § 10, and the nature of the inquiries contemplated by § 11(a)—a veritable code of rules reveals itself for the Commission to follow in giving effect to the standards of § 11(b) (2)."

In line with the above, the Commission has significantly noted that

" * * * in Section 1(b) of the Act, the Congress expressly declared that the national interest and the interest of investors in the securities of holding companies and their subsidiaries are adversely affected 'when such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties.' Section

---

12. The warrants stated a price of $27.50, but because of certain capital distribution approved by the Commission, the question whether the exercise price should be lowered to $19.25 was left open. The conclusions of the Commission are the same whether a price of $19.25 or a price of $27.50 is used. This explains later references to the $27.50 and $19.25 figures.

7(c) of the Act, which lists the type of securities which may be issued by a registered company, does not include warrants. Moreover, Sections 7(d) (1) and (2) expressly provide that no security may be issued if it 'is not reasonably adapted to the security structure' of the issuer and of the other companies in the system or 'is not reasonably adapted to the earning power' of the issuer."

Concerning the meaning of undue or unnecessary complication, we note also that Section 11(e) provides that holding companies may submit voluntary plans "in accordance with such rules and regulations or order as the Commission may deem necessary or appropriate *in the public interest or for the protection of investors or consumers*," and that the Commission, in issuing orders declaring that companies have ceased to be holding companies, may do so upon such terms and conditions as the Commission finds and prescribes as necessary *for the protection of investors*.

■ There can be no doubt that the complication referred to in Section 11(e) can properly apply to outstanding warrants which have been found valueless and which by their terms confer an extremely tenuous right upon the holders. See Central & South West Utilities Co. v. S.E.C., 1943, 78 App.D.C. 37, 136 F.2d 273.

■■ The last point raised on this appeal is whether the cancellation of the warrants was fair and equitable to the holders, as required by Section 11(e). The decision as to whether a plan of reorganization or some feature of it is fair and equitable is one which lies within the discretion of the Commission. Unless there is an abuse of that discretion, the Commission's decision, flowing as it does from its expert judgment, must be accepted so long as the decision is reached in accordance with law. Niagara Hudson Power Co. v. Leventritt, 1951, 340 U.S. 336, 347, 71 S.Ct. 341, 95 L.Ed. 319. As far as warrants are concerned, the Commission's duty

" * * * is first to determine the extent to which they reflect the value of the common stock upon which they have an option. If, for example, the market value of the common stock closely approaches the exercise price stated in the warrants, or if there is ground for a reasonable expectation that the two may coincide within the foreseeable future, then the warrants would have an intrinsic and investment value directly related to the common stock. Under those circumstances, we assume no plan of reorganization would be fair or equitable within the meaning of § 11(e) of the Act that did not recognize that value and provide an equitable equivalent for it.

"On the other hand, if the market value of the common stock is less than $15 per share and there is no ground for a reasonable expectation that, within the foreseeable future, the value will exceed $15 per share, then an option to buy it at, for example, $1,000 per share obviously would be worthless if the measure of its value depends only upon its convertibility into common stock. With such facts, it is difficult to see how the Commission could justify either the continuance of the warrants or any compensation for them at the expense of the existing common stock. The difference between the example last given and the facts of this case is merely one of degree. *Where the line is to be drawn is a matter for the expert judgment of the Commission*." Niagara Hudson Power Corp. v. Leventritt, 1951, 340 U.S. 336, 343–344, 71 S.Ct. 341, 345, 95 L.Ed. 319 (emphasis supplied).

■ In this case the Commission found that, "The recent high market price [of United Corporation's stock] of 4¾ would have to increase about 5.8 times to reach an exercise price for the warrants of $27.50, and about 4 times to reach an exercise price of $19.25," and concluded that there was no reasonable

expectation of such increases in the foreseeable future.

It reached this conclusion by considering United's assets as of December 31, 1950, and estimating future earning capacity. It found that the market value of United's assets was approximately $60,000,000. The market value of the common stock would have to reach approximately $400,000,000 for the warrants to have any value at a $27.50 price. At the $19.25 price, the total market value would have to be $280,000,000. An analysis of the earning power indicated a future earning capacity of approximately 22 cents a share. The common stock would have to sell at approximately 130 times earnings to reach the exercise price of $27.50, or 90 times earnings to reach the $19.25 price. In addition, the Commission considered the terms of the warrants, which expressly provided that the right to purchase common stock meant common stock "as such stock may be constituted at the time of purchase * * * whether or not the rights or interests represented by the shares of Common Stock of the Company authorized or outstanding at the date hereof or at any other time prior to such purchase and irrespective of any change * * * by way of payment of stock dividends, sale, exchange or other disposition of any class of stock of the Company." The certificate also specifically provides that the warrant "does not entitle the holder * * * to any rights whatsoever as a stockholder of the Company." The Commission concluded that the warrant holders' interest was extremely tenuous because there was no protection against future corporate action which could effectively keep the net asset value per share low enough to prevent the common stock from reaching the warrant exercise price. The opinion evidence of two expert witnesses supports the findings of the Commission.

If United were to continue operations in the public utility area, apparently the appellants would have no serious challenge to the Commission's conclusions, nor could they because those conclusions were arrived at in accordance with proper legal standards and are supported by substantial evidence in the record. But they argue that the Commission erred because its analysis of United's future asset value and future earning capacity should have been based on the fact that United was going to become an investment company and would not continue in the public utility area. The Commission was well aware that United was to operate in the future as an investment company. It considered and discussed this in its opinion and concluded that, under all the circumstances and recognizing that United's earnings as an investment company are highly conjectural, it was proper to evaluate United on the basis of its current portfolio. It also discussed its rejection of the expert witness presented by the warrant holders. There is no need to review those considerations here. The Commission, exercising its expert judgment, did so, and no abuse has been shown.

The appellants also say that the two expert witnesses which the Commission contends supported its view did not actually do so. We have read that testimony and disagree with appellants.[13] Be

13. The appellants have argued that when the experts testified about no expectation of value during the foreseeable future, they were referring to the foreseeable future of a five-year period. A reading of the testimony reveals no basis for this argument.

Hickey, for example, was asked, "Q. Going back to the old warrants, is it not a fact that you would have to have fantastic success as an investment company in order to have any intrinsic value in those warrants? A. Well, you would have to have great success, but perpetuity is a fantastically long time, too."

Wallace stated that the issuance of new warrants in exchange for the old could not be justified statistically. He said, "It is our conclusion that, on any basis of capitalization of reasonably anticipated earnings even over a very extended period, or on any basis of conceivable aggregate asset values, it was impossible to reach a value of as much as $27.50 for the common stock or therefore an in-

**610**

that as it may, the Commission's conclusion is sufficiently supported by its own findings, independent of the experts.[14]

We also note that, on the same record, the Court of Appeals for the District of Columbia considered whether the cancellation of the same warrants was fair and equitable and found that it was. See Downing v. S.E.C., 1953, 92 U.S.App. D.C. 172, 203 F.2d 611.

For the foregoing reasons, the order of the District Court will be affirmed.

trinsic value for the warrants." At another point he said, "We can find no intrinsic value for the warrants on any recognized basis of valuation, but we are not prepared to say that there is not some small value there."

The full testimony clearly reveals that statements such as these were not limited to any five-year period.

14. There is no need to consider appellants' arguments concerning who had the burden of proving that the plan was fair and equitable. The record is sufficient to sustain the Commission's conclusions whether or not it had the burden of proof.