**ENVIRONMENTAL ACTION, INC., Western Shoshone National Council, Citizen Alert, Inc., Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent,**

**and**

**Sierra Pacific Resources, Intervenor.**

No. 88–7132.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1989.

Decided Feb. 9, 1990.

Scott Hempling, Environmental Action Foundation, Washington, D.C., Thomas E. Luebben, Luebben and Hughes, Albuquerque, N.M., for petitioners.

Paul Gonson, Sol., Jacob H. Stillman, Associate General Counsel, Eric Summergrad, Asst. Gen. Counsel, Katharine Gresham, (argued), Attorney, Securities and Exchange Commission, Washington, D.C., for respondent.

Reuben Goldberg, Goldberg, Fieldman & Letham, P.C., Aaron Levy, LeBoeuf, Lamb, Leiby & McRae, Washington, D.C., David J. Marchant, Graham & James, San Francisco, Cal., for Sierra Pacific Resources, intervenor.

Before HUG, HALL and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We review a Securities and Exchange Commission order approving a holding company's acquisition of an interest in an electric generating plant. Retail customers of a subsidiary electric utility ask us to set aside the order, including its denial of their request for a formal hearing. We affirm.

## I

In 1935, in a purported effort to protect consumers and investors from abuses associated with public utility holding companies engaged in interstate commerce, Congress enacted the Public Utility Holding Company Act (the "Act" or "PUHCA"). Act of Aug. 26, 1935, c. 687, 49 Stat. 803 *et seq.;* *see In re United Corp.,* 232 F.2d 601, 604 (3d Cir.), *cert. denied,* 352 U.S. 839, 77 S.Ct. 59, 1 L.Ed.2d 56 (1956); 15 U.S.C. § 79a(c). The Act requires holding companies to obtain approval from the Securities and Exchange Commission ("SEC" or "Commission") before they make certain acquisitions of public utility securities. PUHCA § 9(a)(2), 15 U.S.C. § 79i(a)(2). Section 10 of the Act sets forth specific criteria by which the SEC is to evaluate prospective public utility securities acquisitions. 15 U.S.C. § 79j. The Act also permits certain holding companies to obtain exemptions from most of the Act's requirements. PUHCA § 3, 15 U.S.C. § 79c.

Sierra Pacific Resources ("Resources") currently owns 100 percent of the common stock of Sierra Pacific Power Company ("Power Company"), an electric utility company, and as such falls within the definition of a public utility holding company under the Act. 15 U.S.C. § 79b(a)(7)(A).[1] Power Company generates, transmits, distributes, purchases, and sells energy, primarily in Nevada.

Resources seeks to acquire a 14.5 percent interest in a new venture (the "Enterprise") that plans to construct one 250 me-

---

**1.** Section 2(a)(7)(A) defines a "holding company" as "any company which directly or indirectly owns, controls, or holds with power to vote, 10 per centum or more of the outstanding voting securities of a public-utility company...." 15 U.S.C. § 79b(a)(7)(a).

Since 1984, the SEC has classified Resources as exempt under section 3(a)(1) of the Act, which provides an exemption for those holding companies that are "predominantly intrastate in character." 15 U.S.C. § 79c(a)(1). *See* section VII of this opinion, *infra.*

gaWatt ("mW") coal-fired generating unit ("First Unit") at the Thousand Springs Project ("Project") in Nevada.[2] On May 8, 1987, Resources filed an application with the SEC requesting approval for its plan.

Resources's application indicates that a consortium of ten non-utility companies (the "Non–Utility Participants") plans to purchase the remaining Enterprise stock. The Non–Utility Participants will also have preferential status as suppliers of goods and services to Enterprise, which plans to sell electricity wholesale to both publicly and privately owned utilities. Enterprise's Articles of Incorporation provide that its business will be restricted to Nevada and also prohibit it from owning or operating any transmission or distribution equipment.

The SEC issued a notice of filing of Resources's application, providing interested persons an opportunity to request a hearing on the application's merits. Environmental Action, Inc., the Western Shoshone National Council, and Citizen Alert, Inc. (collectively "petitioners"), groups which have members who are retail electric customers of Power Company, made such a request.

The SEC eventually denied petitioners' request for a hearing and authorized Resources's acquisition of Enterprise stock. Memorandum Opinion and Order Authorizing Acquisition of Common Stock of New Electric Generating Company and Denying Requests for Hearing, Holding Company Act Release ("HCAR") No. 35–24566 (Jan. 28, 1988) ("SEC Order"). Petitioners filed a petition for review of the order in this court on March 25, 1988, within the sixty-day limit imposed by section 24(a) of the Act, 15 U.S.C. § 79x(a).

## II

The SEC's findings of facts are conclusive if supported by substantial evidence. PUHCA § 24(a), 15 U.S.C. § 79x(a); *see also SEC v. New England Elec. Sys.*, 390 U.S. 207, 211, 88 S.Ct. 916, 920, 19 L.Ed.2d 1042 (1968) (stressing that, in reviewing a SEC determination made under section 11(b)(1) of the Act, "[j]udicial review of that expert judgment is necessarily a limited one") (citations omitted). In general, an agency's interpretation of the laws it administers is entitled to substantial deference. *Marathon Oil Co. v. United States*, 807 F.2d 759, 765 (9th Cir.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987) (citing *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). Other circuits have employed a similar degree of deference particularly when evaluating the SEC's interpretation of the Act. *See, e.g., SEC v. Associated Gas & Elec. Co.*, 99 F.2d 795, 798 (2d Cir.1938) (stating that the Act's administration is "the peculiar function of the [SEC]" whose interpretation "should control unless plainly erroneous").

We review the SEC's decision to deny petitioners' request for a hearing for an abuse of discretion. *Association of Massachusetts Consumers, Inc. v. SEC*, 516 F.2d 711, 715 (D.C.Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976).

## III

Congress has instructed the SEC to approve a holding company's planned stock acquisition unless the Commission finds that one or more of the conditions outlined in section 10(b) of the Act is present. Based on this section, petitioners make three challenges to the SEC's order.[3]

---

**2.** Enterprise states that it plans to eventually build up to eight 250 mW power plants at the Project. The order we review today, however, only applies to financing construction of the original plant. In fact, Resources has agreed to seek further SEC approval should plans for any of the seven additional plants ever move toward fruition.

**3.** At the outset, we note that of the SEC findings that petitioners challenge, all but one is really a "non-finding." That is, the SEC is required to approve an application for a utilities securities acquisition *unless* it finds that any of the conditions outlined in section 10(b) or section 10(c)(1) are present. The only "affirmative" finding the Commission is required to make before granting approval is that described in section 10(c)(2).

## A

■ Section 10(b)(1) of the Act states that the SEC shall approve a proposed acquisition *unless* it finds that—

(1) such acquisition will tend towards interlocking relations or the concentration of control of public-utility companies, of a kind or to an extent detrimental to the public interest or the interest of investors or consumers.

15 U.S.C. § 79j(b)(1). Federal antitrust policies are to inform the SEC's interpretation of section 10(b)(1). *Municipal Elec. Ass'n v. SEC*, 413 F.2d 1052, 1056–57 (D.C.Cir. 1969); *but see In re American Elec. Power Co.*, 46 S.E.C. 1299, 1313 n. 35 (1978) (suggesting that reliance on antitrust concepts is not justified when the Act provides its own specific standards and that such reliance is appropriate only when the Act does not expressly address the matter to be decided).

The SEC did not find that the acquisition here would result in the "concentration of control" proscribed under section 10(b)(1). In reaching its decision, the Commission relied primarily on a comparison of First Unit's expected 250 mW capacity with the currently existing capacity in the states in which Enterprise will likely seek its wholesale customer base. In discussing this comparison, the SEC concluded that "Resources and Enterprise will be only moderate in size and certainly not a system that would exceed the economies of scale of current electrical generation and transmission technology." SEC Order at 7.

The SEC also considered whether Resources's acquisition of Enterprise stock would result in "anti-competitive effects" and decided that such a finding is unwarranted. In fact, the Commission concluded that Enterprise's entrance into the market "may well increase competition in the region, benefiting those companies which purchase [wholesale] energy and resulting in lower costs to consumers." SEC Order at 7–8.

■ In support of its conclusions, the SEC stated that the 250 mW of energy the First Unit will produce represents just 0.45 percent of the combined existing capacity in Utah, Nevada, Idaho, and California. In addition, the Commission noted that even though the Enterprise plan calls for the construction of eight generating plants (with a combined capacity of 2,000 mW), Resources is required to seek approval of financing for any units built subsequent to the First Unit.

Petitioners assert that the SEC's non-findings in this regard were deficient for several reasons. First, they state that the Commission never explained why and how it selected the markets it used in comparing existing capacity against the First Unit's anticipated capacity. It seems clear, however, that the SEC appropriately selected certain Western states because they lie in Enterprise's likely market for wholesale buyers.

■ Second, petitioners allege that the SEC erred in using existing rather than available capacity in its comparisons. Existing capacity reflects the amount of energy existing plants are currently capable of producing, while available capacity represents existing capacity minus that amount already committed to purchasers under long-term contracts. Petitioners aver that, if there is little or no available capacity in the market, Enterprise could exercise market power as to most or all of the 250 mW the First Unit would generate.

While the use of available capacity may be more appropriate in determining whether the acquisition of Enterprise would allow Resources to control to any degree the market for the 250 mW of energy the First Unit will produce, existing capacity data appear sufficient to support the SEC's findings. Indeed, the statutory language invokes the term *"concentration of control."* And while analysis of "mere size" is not sufficient of itself, *In re American Elec. Power Co.*, 46 S.E.C. at 1309, the term implies that the size of the holding company's market after the acquisition is nonetheless a relevant inquiry. At any rate, there is insufficient evidence to suggest that the addition of such a small increment of energy to the regional market, regardless of available capacity, will give Re-

sources the concentration of control prohibited under section 10(b)(1). We find that the SEC's analysis based on existing capacity is reasonable.[4]

■ Petitioners also contend that the SEC erred in ignoring the potentially adverse impact on competition created by the preferential supplier status the Non–Utility Participants will have. These arrangements, according to petitioners, are exactly the kind with which Congress is concerned, as evinced by its declaration that the public interest is threatened when services and construction transactions arise under conditions representing "restraint of free and independent competition." PUHCA § 1(b)(2), 15 U.S.C. § 79a(b)(2). Petitioners argue that the Non–Utility Participants could charge excessive prices to Enterprise which may well lead to increased prices for consumers should Enterprise "pass on" the increased costs.

In addressing this issue, the SEC relied on two factors. First, it noted that Enterprise will be required to file for approval any proposed rates with the Federal Energy Regulatory Commission ("FERC"). The FERC will have jurisdiction to assess whether the portion of those rates which Enterprise attributes to the costs of construction, goods, and services is just and reasonable. Federal Power Act § 205, 16 U.S.C. § 824d. This point is well-taken because the FERC clearly can disallow the capitalization of certain costs in evaluating rate filings. *See Kentucky Utilities Co. v. FERC,* 760 F.2d 1321, 1325 (D.C.Cir.1985).

Second, the Commission saw market pressures as providing strong incentive for the Non–Utility Participants to keep their prices competitive. This view seems reasonable given that none of the Non–Utility Participants is to acquire more than 9.5 percent of Enterprise's stock. It would be difficult for any one supplier to charge excessive prices without the others objecting that such action will harm the new venture in its endeavor to obtain customers in the wholesale energy marketplace. We

conclude that the SEC adequately considered the "anti-competitive" effects of Resources's planned acquisition.

## B

■ Section 10(b)(2) of the Act states that the SEC shall approve a proposed acquisition unless it finds that the consideration to be paid "is not reasonable or does not bear a fair relation to the sums invested in or the earning capacity of the utility assets to be acquired or the utility assets underlying the securities to be acquired." 15 U.S.C. § 79j(b)(2). The SEC determined that a finding under this section is unwarranted.

The Commission began by analyzing certain capital structure data, *e.g.,* Enterprise's expected 3–to–1 debt-equity ratio and Resources's estimated $21.75 million pro-rata equity investment. Such data give a generalized view on whether Resources's proposed consideration is reasonable. But the Commission then proceeded to more ethereal ground. It stated that:

[b]ecause the revenues of Enterprise necessary to support the servicing of its debt and to provide a reasonable return on its equity are dependent on as yet unascertainable rates which will be established by FERC, and in light of all the circumstances, a finding that the consideration is not reasonable does not seem appropriate.

SEC Order at 9. When the standards the SEC applies are couched in negative terms, *i.e.,* it shall approve the application *unless* it finds that one of the various conditions exists, the Commission's reliance on the unavailability of data concerning those conditions can be problematic.

Nonetheless, under these circumstances, we cannot say that the capital structure data are inadequate to constitute "substantial evidence," which, if present, precludes us from overturning the SEC's findings. *See* PUHCA § 24(a), 15 U.S.C. § 79x(a). Further, because of the FERC's mandate

---

4. We note also that the SEC did make passing reference to the current "substantial capacity *available* to purchasers of electric energy in

Nevada and the surrounding region." SEC Order at 7 (emphasis added).

to ensure that any Enterprise rate schedule will be just and reasonable, we can infer that the rates Enterprise will charge will fall within a certain acceptable range. We therefore uphold the SEC's finding under section 10(b)(2).

## C

■ Section 10(b)(3) instructs the SEC to approve a proposed acquisition unless the transaction would "unduly complicate the capital structure" of the resulting holding-company system or be detrimental "to the public interest or the interest of investors or consumers or the proper functioning" of the system. 15 U.S.C. § 79j(b)(3).

In its section 10(b)(3) analysis, the SEC first investigated the contours of the proposed financing of the Enterprise project and concluded that it fit within conventional boundaries. The Commission relied on Enterprise's 3-to-1 debt-equity ratio and the typical stability and reliability of long-term power contracts as vehicles by which to service major debt adequately, to assure itself of the stability of Enterprise's capital structure.

Next, the Commission superimposed the financing framework of Enterprise onto Resources's capital structure to determine the latter's continuing viability. The Commission found that any adjustments in the proportions of equity and debt in Resources's capital structure would be "modest," and "well within acceptable industry standards."[5] SEC Order at 10. We find that this evidence substantiates the Commission's non-finding under section 10(b)(3).

5. The SEC order passage reads in relevant part:
   [T]he acquisition of Resources' interest in Enterprise can be measured by increasing its consolidated capitalization by 14.5% of $600 million, $87 million, in proportionate amounts based on the 75% debt/25% equity proposed capital structure of Enterprise. In doing so, the effects on Resources' capital structure are modest; common equity is reduced from 42.1% to 40.4%, and long-term debt is increased to 53.3% from 50.9%, ratios well within acceptable industry standards. Generally speaking, acceptable ratios for common stock equity of electric utility operating

■ Finally, the SEC refused to consider petitioners' arguments relating to the plant's planning and management decisions, citing one of its previous orders, *In re Southern Co.*, HCAR No. 21665, 20 SEC Docket 799 (1980). In *Southern*, the Commission stated that "[t]he suggestion that, ancillary to our responsibility to pass on the soundness of a registered system's security sales, we are vested with authority to regulate the operation of registered systems is wholly inconsistent with the scope of the Act." *Id.* at 803. The Commission's reading of the Act in this regard is reasonable, *see City of Lafayette v. SEC*, 454 F.2d 941, 954–56 (D.C.Cir.1971), *aff'd, Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973), and is thus entitled to substantial deference. *Marathon Oil Co.*, 807 F.2d at 765.

## IV

Section 10(c) of the Act consists of two subsections, one of which prohibits the SEC from approving a proposed acquisition *if* it finds that the acquisition would undermine the execution of the provisions of section 11 of the Act, PUHCA § 10(c)(1), 15 U.S.C. § 79j(c)(1). The other prohibits the SEC from approving the acquisition *unless* it makes an affirmative finding relating to the integration of the resulting public utility system. PUHCA § 10(c)(2), 15 U.S.C. § 79j(c)(2).[6] While the Commission issued findings as to both of these subsections, petitioners only challenge those made under section 10(c)(2).

## A

The introductory phrase of section 2(a)(29)(A) contains a definition of "sys-

companies range from 35 to 45%, and such ratios for long-term debt range from 50–60%.
SEC Order at 10 (footnote omitted).

6. Section 10(c)(2) of the Act provides that
   [n]otwithstanding the provisions of [section 10(b) of the Act], the Commission shall not approve ... the acquisition of securities or utility assets of a public-utility or holding company unless the Commission finds that such acquisition will serve the public interest by tending towards the economical and efficient development of an integrated public-utility system.
   15 U.S.C. § 79j(c)(2).

tem" which aids in evaluating whether the criteria in section 10(c)(2) concerning an integrated public-utility system are met. *See* 15 U.S.C. § 79b(a)(29)(A) ("[A] system consisting of one or more units of generating plants and/or transmission lines and/or distributing facilities ..."). The SEC interpreted this language to mean that a system "may consist of 'one or more units' of only one or two of the three types of electric facilities." SEC Order at 15. This reading is reasonable given Congress's use of both the conjunctive and the disjunctive in section 2(a)(29)(A).

From this premise, the Commission concluded that a system could consist entirely of generating plants. Thus, it reasoned, the section cannot be read to require that the proposed post-acquisition entity must distribute all or even any of the additional power it generates to existing retail customers. SEC Order at 15. This interpretation is also appropriate given that a group of generating plants is virtually incapable of directly serving retail customers.

▮ Petitioners set forth two basic challenges to the Commission's interpretation of this introductory language to section 2(a)(29)(A). The first is that the SEC focused solely on the "existing system," a focus that allegedly reads the "tending towards" language out of the section. The second is that the SEC focused solely on the entity sought to be acquired.

Petitioners are correct in stating that both of these interpretations are inconsistent with the wording of the Act. They are incorrect, however, in asserting that either one represents the SEC's position here. The focus, as the Commission correctly analyzed, is on both the acquiror and the acquiree, as the SEC must discern whether joining the holdings of the two will tend towards an integrated public-utility system.

*Cf. Wisconsin's Environmental Decade v. SEC,* 882 F.2d 523, 527–28 (D.C.Cir.1989).

▮ The SEC found that, although Power Company is not actually required to purchase any of the First Unit's output, the integration requirement can be met, so long as the post-acquisition entity complies with all requirements under section 2(a)(29)(A). We find that the SEC's decision is both reasonable and permissible. *Chevron U.S.A. Inc.,* 467 U.S. at 843, 104 S.Ct. at 2781.

**B**

▮ Section 2(a)(29) of the Act defines the term "integrated public-utility system"[7] and hence provides the analytical framework by which to evaluate section 10(c)(2). From this statutory definition, the SEC has established four distinct standards that must be met before the Commission can find that an integrated public-utility system will result from a proposed acquisition. These are:

(1) the utility assets of the system are physically interconnected or capable of physical interconnection;

(2) the utility assets, under normal conditions, may be economically operated as a single interconnected and coordinated system;

(3) the system must be confined in its operations to a single area or region; and

(4) the system must not be so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation.

*In re Electric Energy, Inc.,* 38 S.E.C. 658, 668 (1958).

---

7. Section 2(a)(29) states in relevant part that:

As applied to electric utility companies, a system consisting of one or more units of generating plants and/or transmission lines and/or distributing facilities, whose utility assets, whether owned by one or more electric utility companies, are physically interconnected or capable of physical interconnection and which under normal conditions may be eco-

nomically operated as a single interconnected and coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair (considering the state of the art and the area or region affected) the advantages of localized management, efficient operation, and the effectiveness of regulation.

15 U.S.C. § 79b(a)(29).

**1.**

In *In re Electric Energy, Inc.*, 38 S.E.C. 658 (1958), the SEC found that the physical interconnection standard was met when four companies sponsoring an acquisition planned to build transmission lines to allow all of them access to the generating plant they sought to acquire. *Id.* at 668–70; *see also Centerior Energy Corp.*, HCAR No. 35–24073, 35 SEC Docket 769, 774 (April 29, 1986) ("[t]he physical interconnection requirements of [section 10(c)(2) ] are met if the two service areas are connected by power transmission lines that the companies have the right to use whenever needed"). The SEC's opinion in *Electric Energy, Inc.* suggests that an entity has a "right" to use a line whenever there is "an arrangement which afford[s] the [entity] the privilege of using the line for transmission purposes." *In re Electric Energy, Inc.*, 38 S.E.C. at 670 n. 24.

In finding the physical interconnection standard satisfied here, the SEC noted that a new transmission line will link the First Unit to an existing Power Company transmission line. SEC Order at 13–14. It also considered the benefits accruing to both parties as a result of the link-up, as the connection would not only allow Resources to purchase energy from Enterprise but also would allow Enterprise to transmit energy it sells to other wholesale purchasers as well. SEC Order at 14. This evidence substantially supports the SEC's finding that the two entities will be physically interconnected as that term is used in the Act.

**2.**

The SEC found that the proposed acquisition met the economic and coordinated operations standard as well, based in part upon a letter the President of Power Company wrote to the policy committee of the Project in which he stated that Power Company might purchase up to twenty percent of the First Unit's capacity "if the price of such power is competitive in the market." [8] Further, the Commission found that even if Power Company did not buy energy from Enterprise, Enterprise and Power Company would be coordinated because Enterprise would have to use Power Company's transmission line to send energy to its customers, a service for which Power Company would be paid.[9]

Petitioners argue that because Power Company has no binding obligation to purchase any energy from Enterprise, the SEC erred in finding that the two entities will be effectively coordinated. The Commission previously has approved of an acquisition, however, in which the companies sponsor-

---

8. Petitioners dispute the veracity as well as the SEC's interpretation of the letter, citing to testimony proffered before the Nevada Public Service Commission by a Power Company Vice–President. Petitioners argue that (1) the letter does not obligate Power Company to purchase energy from Enterprise; and (2) the Enterprise project is unrelated to Power Company's future energy needs.

The SEC, however, expressly recognized that Power Company could end up not purchasing any of Enterprise's output. *See* SEC Order at 14. Moreover, as discussed in the text, the presence of binding obligations on the part of Power Company to purchase energy from Enterprise is not a prerequisite to SEC approval of this acquisition. Finally, the same witness whose testimony petitioners rely upon to challenge the letter, also testified that it is "conceivable" that Power Company could need 50 mW of energy by 1994. *See* Transcript of Proceedings Before The Public Service Commission of Nevada, Vol. VII at 1528, *reprinted in* Tr. at 495. We thus find that substantial evidence in the record supports the SEC's determination that the pro-

posed acquisition will result in economic and coordinated operations.

9. The SEC also notes that "Resources may realize benefits from the return on its 14.5% interest in Enterprise.... If increased earnings are realized by Resources and/or Power Company this will enhance the financial stature of the entire system and redound to the benefit of investors and consumers." SEC Order at 14.

These observations add nothing to support the Commission's finding of economical and coordinated operations. First, they are based on mere speculation without any statistical support whatsoever. *See North American Co.*, 11 S.E.C. 194, 243 (1942) (section 2(a)(29)(A) "certainly [ ] does not refer to conditions which might occur in the remote future, and whose occurrence has not been foreshadowed by any facts shown in the record"). Second, such statements could literally be made about any proposed acquisition; *i.e.*, if the company to be acquired succeeds financially, the acquiring holding company will benefit.

ing the construction of a generating plant only pledged to buy any surplus energy left over after the plant had supplied the needs of the major purchaser, a non-affiliated government agency. *In re Electric Energy, Inc.*, 38 S.E.C. at 670–71. Moreover, power contracts need not be signed and approved before the SEC will approve acquisition of an interest in a generating plant. *See Vermont Yankee Nuclear Power Corp.*, 43 S.E.C. 693, 702 (1968), *rev'd on other grounds*, 413 F.2d 1052 (D.C.Cir.1969). We therefore will not strike down the SEC's finding on this issue.

### 3.

The Commission found the single area or region standard satisfied because the First Unit is to operate in "one of the areas (Northeastern Nevada) in which Power Company operates and will be close to Power Company's service territory." SEC Order at 13. Distances of up to 100 miles across two states between a generating station and an acquiror's service area have been upheld under this section. *In re Electric Energy, Inc.*, 38 S.E.C. at 671–72. In the instant case, the First Unit will be located only fifty-eight miles away from Power Company's service area. The fact that the First Unit is located within the same region of Nevada as a large portion of Power Company's retail service market is evidence sufficient to uphold the SEC's finding.

### 4.

In addition to the evidence outlined above, it is contemplated that all of Enterprise's sales will take place at the First Unit site. Further, the SEC noted that under the planned operating arrangement, "the First Unit will automatically respond to load changes and other occurrences on Power Company's system." SEC Order at 14. And, although far from uncontroverted, there is evidence indicating that Power Company will need additional energy to service its retail market by the time construction of the First Unit is completed in 1994. Under these circumstances, we find that the localized management, efficient op-

eration, and effectiveness of regulation standard is met.

### 5.

The Commission recently made clear that section 10(c)(2) contains a distinct fifth component which must be found to exist, that pertaining to economies and efficiencies. *Centerior Energy Corp.*, HCAR No. 35–24073, SEC Docket 769, 775 (April 29, 1986) ("[h]aving concluded that [the resulting public-utility system] would be an integrated one, we must determine whether the affiliation will tend toward [the system's] economical and efficient development"). To meet this standard, "a demonstrated potential for economies will suffice even when these are not precisely quantifiable." *Id.* We find that this standard is met here.

This transaction is unlike the traditional acquisition in which two existing systems merge or coordinate. The potential savings and improvements in efficiency in that type of transaction can be easily forecast. *See id.* In this case, the most that can be established is a demonstrated potential for economical and efficient operation.

As we noted earlier, there is evidence in the record that Power Company will require additional capacity by 1994, when the First Unit is scheduled for completion. Moreover, the First Unit and Power Company will be interconnected through the new transmission line, allowing both entities to use Power Company's existing service path. We conclude that, under the circumstances of this unique transaction, the evidence is sufficient to demonstrate a potential for economical and efficient operations.

### V

In determining whether to grant a request for a hearing in regard to an acquisition application under the Act, the SEC analyzes whether the request "raises a significant issue of fact or law that is relevant to the issues the Act requires the Commission to consider." *Centerior Energy Corp.*, HARC No. 35–24073, 35 SEC Docket at 777 (drawing criteria from 17 CFR § 250.23(d) (a hearing is appropriate if it

would be "in the public interest or the interest of investors or consumers")). By itself, an assertion that a particular standard of the Act has or has not been met does not raise a significant issue of fact or law. *Id.* Rather, "petitioners must make an adequate proffer of evidence to support" the existence of disputed facts so as to warrant a hearing. *Cerro Wire & Cable Co. v. FERC*, 677 F.2d 124, 129 (D.C.Cir. 1982).

Here, the SEC denied petitioners' request for a hearing, stating that "none of the issues propounded by [petitioners] raises significant questions of fact or law that make a hearing by this Commission appropriate." SEC Order at 15.

As set forth above, the facts for the most part are not in dispute. Moreover, the legal standards the SEC used are well-established, and petitioners have failed to mount a serious challenge to any of the Commission's legal interpretations. The SEC did not abuse its discretion in denying the request for a hearing.

## VI

■ Section 3(a)(1) provides an exemption from the Act for holding companies which are primarily intrastate in character. 15 U.S.C. § 79c(a)(1); [10] 17 CFR § 250.2(a). To qualify for an exemption under this section, a holding company and each of its public utility subsidiaries must be (1) organized under the laws of a single state, and (2) predominantly intrastate in character and carry on their business substantially in a single state. *In re Washington Ry. & Elec. Co.*, 4 S.E.C. 191, 192 (1938). In addition, the Commission shall not grant the exemption if to do so would be detrimental to the interests of the public in general, or consumers or investors in the

proposed venture in particular. 15 U.S.C. § 79c(a).

■ The SEC has the discretion to terminate a holding company's exemption at any time. 17 C.F.R. § 250.6. Pursuant to its own rule, however, the SEC must give an exempt company thirty days notice of its intention to terminate the company's exempt status. *Id.* The SEC merely expressed its opinion here that Resources's acquisition of an interest in Enterprise would not cause it to lose its existing exemption under section 3(a)(1). SEC Order at 19–20.

The SEC and Resources argue that this court does not have jurisdiction to review the SEC's exemption findings. They contend that the Commission's finding was "separate" from the acquisition application, and that a formal notice concerning possible termination of the exemption was not issued to Resources even though it clearly anticipated an updated exemption ruling.

We decline to consider the exemption issue. The petition is for review of the order granting the application. The Commission's order did not grant or revoke any exemption. In any event, we cannot help noting that the Articles of Incorporation prohibit Enterprise from doing business in any state other than Nevada, where Power Company currently conducts most of its business. *See* Articles of Incorporation of [Enterprise] at 3, *reprinted in* Tr. at 19, 21.

## VII

We find that there is "substantial evidence" to support the SEC's decision to grant Resources's application. Moreover, the SEC did not abuse its discretion in denying petitioners' request for a hearing. Finally, because the Commission's order

---

**10.** Section 3(a)(1) provides in relevant part that: The Commission ... shall exempt any holding company, and every subsidiary company thereof as such, from any provision or provisions of this chapter, unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers, if—(1) such holding company, and every subsidiary company thereof which

is a public-utility company from which such holding company derives, directly or indirectly, any material part of its income, *are predominantly intrastate in character and carry on their business substantially in a single State* in which such holding company and every such subsidiary company thereof are organized.

15 U.S.C. § 79c(a)(1) (emphasis added).

neither granted nor revoked Resources's exemption, we decline to reach that issue.

AFFIRMED.